**IOWA UTILITIES BOARD, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**The SOUTHERN NEW ENGLAND TELEPHONE COMPANY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**BELL ATLANTIC CORPORATION; Bellsouth Corporation; Pacific Telesis Group, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

**AMERITECH CORPORATION, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.**

US WEST, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

GTE SERVICE CORPORATION; GTE Alaska, Incorporated; GTE Arkansas, Incorporated; GTE California, Incorporated; GTE Florida, Incorporated; GTE Midwest, Incorporated; GTE South, Incorporated; GTE Southwest, Incorporated; GTE North, Incorporated; GTE Northwest, Incorporated; GTE Hawaiian Telephone Company, Incorporated; GTE West Coast, Incorporated; Contel of California, Inc.; Contel of Minnesota, Inc.; Contel of the South, Inc., Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

NEW YORK TELEPHONE COMPANY;
New England Telephone and Telegraph
Company, Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

CINCINNATI BELL TELEPHONE
COMPANY, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

PEOPLE OF the STATE OF NEW YORK;
The Public Service Commission of the
State of New York, Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

SBC COMMUNICATIONS,
INC., Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

LOUISIANA PUBLIC SERVICE
COMMISSION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

FLORIDA PUBLIC SERVICE
COMMISSION,
Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

SOUTH DAKOTA PUBLIC UTILITIES
COMMISSION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

The PEOPLE OF the STATE OF CALIFORNIA; The Public Utilities Commission of the State of California, Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

UNITED STATES TELEPHONE
ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

RURAL TELEPHONE COALITION,
Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

420

COMPETITIVE
TELECOMMUNICATIONS
ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

MISSISSIPPI PUBLIC SERVICE
COMMISSION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

Nos. 96–3321, 96–3406, 96–3410, 96–3414, 96–3416, 96–3418, 96–3424, 96–3430, 96–3436, 96–3444, 96–3450, 96–3453, 96–3460, 96–3507, 96–3519, 96–3520, 96–3603, 96–3604 and 96–3608.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 3, 1996.

Filed Oct. 15, 1996.

William Barr, Stamford Connecticut, argued for the local exchanges, and Diane Munns, Des Moines, Iowa, argued for the state utilities boards.

Christopher Wright, Washington, DC, argued for respondents.

David Carpenter, Chicago, Illinois, argued for intervenors.

Before BOWMAN, WOLLMAN and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

These cases have been consolidated in this circuit by the September 11, 1996 order of the Judicial Panel on Multidistrict Litigation, Docket No. RTC–31, pursuant to Rule 24 of the *Rules of Procedure of the Judicial Panel on Multidistrict Litigation. See* 28 U.S.C. § 2112(a)(3) (1994). Numerous petitioners have moved this court for a stay pending judicial review of the Federal Communications Commission's First Report and Order.[1] The FCC promulgated the rules and regula-

tions in its First Report and Order pursuant to its reading of its statutory duty to implement the local competition provisions of the Telecommunications Act of 1996 (the Act).[2] This court granted a temporary stay on September 27, 1996, pending oral argument. After hearing oral argument on October 3, 1996, from representatives of the concerned parties, we have decided to stay the operation and effect of only the pricing provisions[3] and the "pick and choose" rule[4] contained in the FCC's First Report and Order pending our final determination of the issues raised by the pending petitions for review.

I.

In the Telecommunications Act of 1996, Congress enacted a plan to alter the monopolistic structure of local telephone service markets with an injection of competition. The Act effectively opens up local markets by imposing several new obligations on the existing providers of local telephone service in those markets. The Act refers to the current local providers as "incumbent local exchange carriers" (incumbent LECs). *See* 47 U.S.C.A. §§ 251(c), (h), 252(j) (West Supp. May 1996). Among other duties, the Act requires incumbent LECs (1) to allow other telecommunication carriers (such as cable television companies and current long-distance providers) to interconnect with the incumbent LEC's existing local network to provide competing local telephone service (interconnection); (2) to provide other telecommunication carriers access to elements of the incumbent LEC's local network on an unbun-

---

1. First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96–98 (Aug. 8, 1996) [hereinafter First Report and Order].

2. Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (to be codified as amended in scattered sections of 47 U.S.C.).

3. The pricing provisions refer to First Report and Order, Appendix B–Final Rules §§ 51.501–

51.515 (inclusive), 51.601–51.611 (inclusive), 51.701–51.717 (inclusive) and to the default proxy range for line ports used in the delivery of basic residential and business exchange services established in the FCC's Order on Reconsideration, dated September 27, 1996.

4. The "pick and choose" rule refers to First Report and Order, .Appendix B–Final Rules § 51.809.

dled basis (unbundled access); and (3) to sell to other telecommunication carriers, at wholesale rates, any telecommunications service that the incumbent LEC provides to its retail customers (resale). *Id.* § 251(c).

To accomplish these directives, the Act places a duty on incumbent LECs to privately negotiate, in good faith, comprehensive agreements with other telecommunication carriers seeking to enter the local market. *See id.* §§ 251(c)(1), 252(a). If the incumbent LEC and the carrier seeking entry are unable to reach a negotiated agreement, either party may petition the respective state utility commission to conduct a compulsory arbitration of the open and disputed issues and arrive at an arbitrated agreement. *See id.* § 252(b). The final agreement, whether arrived at through negotiation or arbitration, must be approved by the state commission. *Id.* § 252(e)(1). Certain portions of the Act also require the FCC to participate in the Act's implementation. *See, e.g., id.* §§ 251(b)(2), (d)(1), (e), 252(e)(5). The FCC's regulations pertaining to the Act form the heart of the controversies at bar.

On August 8, 1996, the FCC released its First Report and Order in which it published its comments and rules regarding the local competition provisions of the Act. The petitioners in this consolidated proceeding, consisting, at the moment, primarily of incumbent LECs and state utility commissions, argue that the FCC exceeded its authority in promulgating these rules. While several of the petitioners object to the FCC's regulations in their entirety, others specifically challenge the FCC's rules regarding the prices that an incumbent LEC may charge an incoming competitor for interconnection, unbundled access to network elements, and resale of its services.

Despite the different approaches, it is clear that all of the petitioners object principally to the FCC's pricing rules. One such rule is a

mandate from the FCC that state commissions employ the "total element long-run incremental cost" (TELRIC) method to calculate the costs that an incumbent LEC incurs in making its facilities available to competitors. *See* First Report and Order, Appendix B–Final Rules §§ 51.503, 51.505. After applying the TELRIC method and arriving at a cost figure, the state commissions, acting as arbitrators, must then determine the price that an incumbent LEC may charge its competitors, based on the TELRIC driven cost figure. *See id.*

Many of the incumbent LECs object to the TELRIC method for two reasons. First, it does not consider their "historical" or "embedded" costs (costs that an incumbent incurred in the past) in calculating the cost figure to be used to determine the rates. *See id.* § 51.505(d)(1). Second, it requires that an incumbent LEC's cost be measured as if the incumbent were using the most efficient telecommunications technology currently available, regardless of the technology presently employed by the incumbent and to be used by the competitor. *See id.* § 51.505(b)(1). The incumbent LECs argue that the TELRIC method underestimates their costs and results in prices that are too low. The incumbent LECs maintain that these low prices would effectively require them to subsidize their competitors and thereby threaten the viability of the LECs' own businesses.

For similar reasons, the petitioners also object to the FCC's proxy rates, which are to be used by the state commissions if they elect not to employ the TELRIC method to set prices. *See id.* §§ 51.503(b)(2), 51.513, 51.705(a)(2), 51.707. The incumbent LECs argue that these proxy rates do not accurately reflect their costs and are artificially low. In addition to the rules regarding TELRIC and the proxy rates, the petitioners object to several other FCC regulations that pertain to the pricing of intrastate telephone service.[5]

---

5. The state utilities commissions take issue with the "deaveraging" rule requiring them to establish different rates in at least three different geographic areas within each state. *See id.*

Some of the petitioners also seek to stay the FCC's so-called "pick and choose" rule, *id.* § 51.809, with which the FCC purports to implement § 252(i) of the Act. Section 252(i) requires an LEC to make available any interconnection, service, or network element contained in an approved agreement to which it is a party to any other telecommunications carrier upon the same "terms and conditions" as those provided in the agreement. Here again, price becomes a key issue. When the FCC promulgated its rule, it expanded the statutory language of § 252(i) to include "*rates,* terms, and conditions." *Id.* § 51.809 (emphasis added). The petitioners' objection is that the rule would permit the carriers seeking entry into a local market to "pick and choose" the lowest-priced individual elements and services they need from among all of the prior approved agreements between that LEC and other carriers, taking one element and its price from one agreement and another element and its price from a different approved agreement. Moreover, if an LEC and Carrier A, for example, reach an approved agreement, and then the LEC and a subsequent entrant, Carrier B, agree in their agreement to a lower price for one of the elements or services provided for in the LEC's agreement with Carrier A, Carrier A will be able to demand that its agreement be modified to reflect the lower cost negotiated in the agreement with Carrier B. Consequently, the petitioners assert that the congressional preference for negotiated agreements would be undermined because an agreement would never be finally binding, and the whole methodology for negotiated and arbitrated agreements would be thereby destabilized.

## II.

◼ We consider the following four factors in determining whether a stay is warranted: (1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay. *See Arkansas Peace Ctr. v. Dep't of Pollution Control,* 992 F.2d 145, 147 (8th Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *Wisconsin Gas Co. v. F.E.R.C.,* 758 F.2d 669, 673–74 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1968, 1969, 90 L.Ed.2d 653 (1986). Applying these factors to the case at hand leads us to conclude that a stay pending final review of the FCC's pricing and "pick and choose" rules is justified.

### A.

◼ In evaluating the likelihood of the petitioners' success on appeal, we note that the petitioners "need not establish an absolute certainty of success." *Population Inst. v. McPherson,* 797 F.2d 1062, 1078 (D.C.Cir. 1986). Instead, as the actual terms of the test indicate, the petitioners must show that they are "likely" to succeed on the merits. Here, the petitioners allege primarily that the FCC exceeded its jurisdiction by imposing national pricing rules for what is essentially local service. They argue that the text and the structure of the Act give the States, not the FCC, authority over the pricing of intrastate telephone service. After evaluating the contentions of all of the interested parties, we believe that the petitioners present a strong argument that is sufficient to satisfy the first prong.

Historically, the state commissions have determined the rates for intrastate communications services. *See* Communications Act of 1934, § 2(b), 47 U.S.C. § 152(b) (1994). Subsection 252(d), which indicates that state commissions have the authority to determine "just and reasonable rates" necessary to implement the local competition provisions of

§ 51.507(f). Many of the incumbent LECs also challenge the FCC's wholesale rate rules, asserting that the FCC's mandated method for calculating these rates, as well as its interim wholesale rates, result in rates that are also too low and threaten the incumbent LECs' viability. *See id.* §§ 51.607, 51.609, 51.611.

the Act, appears consistent with that past practice. This subsection, entitled "Pricing standards," makes no mention of FCC rules on pricing. Moreover, subsection 252(c)(2) directs state commissions to "establish any rates for interconnection, services, or network elements according to subsection (d) of this section." Again, no reference is made to FCC regulations regarding rates. By contrast, where Congress intended for the state commissions to follow FCC rules in arbitrations, it expressly said so. In subsection 252(c)(1), the Act requires state commissions to ensure that their resolutions of arbitrated disputes comply with both section 251 and with the regulations that the FCC is specifically authorized to issue under section 251. But nowhere in section 251 is the FCC specifically authorized to issue rules on pricing. The sections of the Act that directly authorize the state commissions to establish prices are devoid of any command requiring the state commissions to comply with FCC pricing rules (or, for that matter, authorizing the FCC to issue any pricing rules). This absence indicates a likelihood that Congress intended to grant the state commissions the authority over pricing of local telephone service, either by approving or disapproving the agreements negotiated by the parties, or, when the parties cannot agree, through compulsory arbitration, thereby preserving what historically has been the States' role.

We are mindful of the FCC's contrary interpretation of the Act. The FCC asserts that subsection 251(d)(1), when read together with subsection 252(c)(1), authorizes the FCC to establish rules regarding pricing. Subsection 251(d)(1) directs the FCC to complete the promulgation of regulations pursuant to its duties under section 251 by August 8, 1996. The FCC also urges us to read the general provisions of subsection 251(c) together with subsection 252(d) (the pricing standards) and conclude that these portions of the Act supply the FCC with the power to issue pricing rules.

We recognize that courts must give deference to an agency's reasonable interpretation of an unclear statute. See *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). In this case, however, we believe that the petitioners have a better than even chance of convincing the court that the FCC's pricing rules conflict with the plain meaning of the Act, in which case the court would not be bound by *Chevron* deference and would be entitled to overturn the agency's interpretation. See *id.* at 842–43, 104 S.Ct. at 2781 ("If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *id.* at 844, 104 S.Ct. at 2782–83 (indicating that courts should not give controlling weight to regulations that are contrary to the statute). In this, our first look at the issue, we are skeptical that the FCC's roundabout construction of the statute could override what, at first blush, appears to be a rather clear and direct indication in subsections 252(c)(2) and 252(d) that the state commissions should establish prices.

Moreover, we have serious doubts that the FCC's interpretation of the Act constitutes the straightforward or unambiguous grant of intrastate pricing authority to the FCC sufficient to qualify as an exception to the provisions of subsection 2(b) of the Communications Act of 1934, 47 U.S.C. § 152(b) (1994). See *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 377, 106 S.Ct. 1890, 1903, 90 L.Ed.2d 369 (1986). Subsection 2(b) provides that "nothing in this Chapter shall be construed to apply or to give the [FCC] jurisdiction with respect to ... charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communications service." 47 U.S.C. § 152(b) (1994). In *Louisiana*, the Supreme Court determined that in order to overcome subsection 2(b)'s limits on the FCC's jurisdiction with respect to intrastate communications service, Congress must "unambiguously" or "straightforwardly" either modify subsection 2(b) or grant the FCC additional authority. 476 U.S. at 377, 106 S.Ct. at 1903. We acknowledge that portions of the

Telecommunications Act of 1996 expressly grant the FCC authority over some aspects of intrastate telephone service. *See, e.g.,* 47 U.S.C.A. § 251(e) (West Supp. May 1996) (FCC authority regarding numbering administration). We have been unable, however, to find such an express grant of authority to the FCC over the pricing of intrastate telephone service, nor does there appear to be a modification of subsection 2(b).[6] The combination of these omissions indicates a sufficient likelihood that the petitioners will succeed on the merits of their appeal. We, of course, remain open to being persuaded that the FCC's read is the correct one when full briefing and argument on the merits have been concluded.

Because we believe that the petitioners have demonstrated that they will likely succeed on the merits of their appeals based on their argument that, under the Act, the FCC is without jurisdiction to establish pricing regulations regarding intrastate telephone service, we think that it is unnecessary at this time to address the remaining theories which the petitioners use to challenge the legality of the FCC's pricing rules.

### B.

With respect to the likelihood of irreparable harm, the petitioners initially assert that their interest in productive ongoing negotiations and arbitrations regarding the implementation of the Act will be irreparably harmed if the FCC's pricing regulations are not stayed. They argue that the competitors seeking entry into the local phone markets will refuse even to consider prices that are higher than the FCC's proxy rates and will simply hold out for the proxy rates that the States will feel obligated to impose in their arbitrations. In this manner, the proxy rates effectively establish a price ceiling, an observation recognized by the FCC itself, which inevitably confines and restricts the give and take characteristic of free negotiations and arbitrations. The state commissions specifically argue that the FCC's pricing regulations effectively undermine their authority,

and if not stayed, the rules will disrupt the predictability and continuity of the existing regulatory system. The state commissions explain that the FCC pricing rules essentially handcuff their discretion in determining the just and reasonable rates in arbitrations required under subsection 252(d)(1).

In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *See Packard Elevator v. I.C.C.,* 782 F.2d 112, 115 (8th Cir.1986), *cert. denied,* 484 U.S. 828, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987) (quoting *Wisconsin Gas,* 758 F.2d at 673–74). The FCC asserts that the petitioners' allegations of irreparable harm are merely speculative and that there is no certainty that its proxy rates will ever be applied to the petitioners. We are persuaded, however, by the petitioners' evidence that the negotiations preferred by the Congress are already breaking down due to the competitors' desire to hold out for the FCC's proxy rates. Moreover, given the time constraints under the Act, some state commissions have already felt obliged to impose the proxy rates in their arbitrations. These experiences indicate that the FCC's pricing rules will derail current efforts to negotiate and arbitrate agreements under the Act, and the "pick and choose" rule will operate to further undercut any agreements that are actually negotiated or arbitrated. The inability of the incumbent LECs and the state commissions to effectively negotiate and arbitrate agreements free from the influence of the FCC's pricing rules, including the "pick and choose" rule, will irreparably injure the interests of the petitioners. If the FCC's rules are later struck down, it will be extremely difficult for the parties to abandon the influence of their previous agreements that were based on the national pricing rules and to recreate the atmosphere of free negotiations that would have existed in the absence of the FCC's dictated presumptive prices. Without a stay, the opportunity for effective private negotiations will be irretrievably lost. We initially

---

**6.** In fact, we are told that a provision which specifically modified subsection 2(b) was expressly rejected by Congress before the bill was passed. *See* S. 652, 104th Cong., 1st Sess. § 101(c) (1995).

believe that this result would be contrary to Congress's intent that these matters be resolved through negotiation and/or arbitration.

The petitioners also argue that the FCC's pricing rules will force the incumbent LECs to offer their services to requesting carriers at prices that are below actual costs, causing the incumbent LECs to incur irreparable losses in customers, goodwill, and revenue. The FCC contends that its pricing rules, in particular its proxy rates, are merely an option for the parties and the state commissions to consider, and consequently the petitioners cannot make a showing that the harm is certain and imminent, as required in *Packard Elevator*, 782 F.2d at 115. As we explained above, we are persuaded that, absent a stay, the proxy rates would frequently be imposed by the state commissions and would result in many incumbent LECs suffering economic losses beyond those inherent in the transition from a monopolistic market to a competitive one. We are mindful of the precedents that declare that "economic loss does not, in and of itself, constitute irreparable harm," *Wisconsin Gas*, 758 F.2d at 674, and that "revenues and customers lost to competition which can be regained through competition are not irreparable." *Central & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 309 (D.C.Cir.1985), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Both of these propositions, however, rest on the assumption that the economic losses are recoverable. The threat of unrecoverable economic loss, however, does qualify as irreparable harm. *See Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir.1994); *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir.1987). In this case, the incumbent LECs would not be able to bring a lawsuit to recover their undue economic losses if the FCC's rules are eventually overturned, and we believe that the incumbent LECs would be unable to fully recover such losses merely through their participation in the market. Moreover, the petitioners' potential loss of consumer goodwill qualifies as irreparable harm. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir.

1994) (holding that the possibility of permanent loss of customers to a competitor or the loss of goodwill satisfies the irreparable injury prong). For the foregoing reasons, we believe that the petitioners have adequately demonstrated that they will be irreparably harmed if a stay of the FCC's pricing rules is not granted.

### C.

In assessing whether others will be harmed if the court grants the stay, we acknowledge that our decision, either way, will unavoidably adversely affect the interests of either the incumbent LECs or their potential competitors. If we decide to grant the stay, we recognize that the companies seeking entry into the local telephone markets will have to negotiate and arbitrate their agreements without the added leverage of the FCC's pricing rules, and assuming that the FCC's rules were later upheld, they would likely renegotiate the terms of their agreements. The inconvenience of this scenario, however, is outweighed by the harm and difficulties of its alternative, discussed in the previous section. In other words, we think that it would be easier for the parties to conform any variations in their agreements to the uniform requirements of the FCC's rules if the rules were later upheld than it would be for the parties to rework agreements adopted under the FCC's rules if the rules were later struck down. Consequently, we conclude that any harm that other parties may endure as a consequence of imposing a stay is outweighed by the irreparable injury that the petitioners would sustain absent a stay.

### D.

The FCC argues that a stay would not promote the public interest because it would not maintain the status quo and it would block the road to competition in local telephone service markets. We reject both contentions. Before the FCC published its regulations pursuant to the Act, several incumbent LECs, potential competitors, and state utility commissions were all working together to implement the local competition provisions of the Act. The Act's system of

private negotiation backed by state-run arbitration was operating without the input from the FCC. A stay would preserve the continuity and stability of this regulatory system—a system that has initially proved to be successful. The FCC asserts that without its pricing regulations in effect, the incumbent LECs will be able to exert their superior bargaining power over their potential competitors and impose unreasonable rates for their services. This argument ignores the empirical success that private parties and the state commissions have had in implementing the local competition provisions of the Act.[7] It also denigrates the proven ability of the state commissions to prevent incumbent LECs from charging excessive rates for their services. The Act requires rates to be just and reasonable and it authorizes state commissions to enforce these requirements. Presently, we have no reason to doubt the ability of the state commissions to fulfill their duty to promote competition in the local telephone service markets and thus conclude that the public interest weighs in favor of granting a stay.

## III.

Having concluded that the petitioners satisfy the four requirements for granting a stay, we grant the petitioners' motion to stay the FCC's pricing rules and the "pick and choose" rule contained in its First Report and Order[8] pending a final decision on the merits.

Upon the filing of this order, the stay imposed by our order of September 27, 1996, is dissolved, and is replaced by the stay imposed by the terms of this order.

---

7. We note that some states, Connecticut, Florida, and Iowa in particular, have already established rates based on local conditions and are already involved in opening up their local markets to competition under both the federal Act and state statutes which foreshadowed the new federal law. Moreover, the FCC-imposed rate for Iowa is substantially higher than the state-set rate which was based on the full record from a contested case proceeding, while in Florida, the FCC proxy rate is substantially lower than the state-set rate.

8. The stay pertains only to §§ 51.501–51.515 (inclusive), 51.601–51.611 (inclusive), 51.701–51.717 (inclusive), § 51.809, and the proxy range for line ports used in the delivery of basic residential and business exchange services established in the FCC's Order on Reconsideration, dated September 27, 1996.