**TCG MILWAUKEE, INC., Plaintiff,**

v.

**PUBLIC SERVICE COMMISSION OF WISCONSIN and Wisconsin Bell, Inc. d/b/a Ameritech Wisconsin, Defendants.**

No. 97–C–0110–C.

United States District Court,
W.D. Wisconsin.

Oct. 15, 1997.

James E. Bartzen, Boardman, Surh, Curry & Field, Madison, WI, for TCG Milwaukee, Inc.

Glenn Kelley, Public Service Com'n of WI, Chief Counsel, Madison, WI, for Public Service Com'n of WI.

John R. Dawson, Foley & Lardner, Milwaukee, WI, for Wisconsin Bell, Inc. Ameritech Wisconsin.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory relief brought pursuant to the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (to be codified at various sections of 47 U.S.C.). Plaintiff provides local telephone service in southeastern Wisconsin. To compete for customers in this market, plaintiff entered into negotiations with defendant Ameritech Wisconsin aimed at establishing an agreement to interconnect with Ameritech's telephone network. Because plaintiff and defendant Ameritech were unable to resolve all terms necessary to complete the interconnection agreement, they submitted three issues for compulsory arbitration. One such issue before the arbitration panel was the form of reciprocal compensation rates for the transport and termination of local telephone traffic. In its decision, the panel adopted defendant Ameritech's "cost-based" compensation proposal, set a rate for calls routed through a "tandem" switch that is higher than for calls handled by an "end-office" switch, and priced plaintiffs only switching mechanism in Wisconsin at the end-office rate.

This case is before this court on plaintiffs and defendant Ameritech's cross-motions for summary judgment. Plaintiff contends that the arbitration panel exceeded its authority when it determined the nature of plaintiffs switch, that this issue was not properly before the panel because neither party to the arbitration proceedings had asked the panel explicitly to decide it and that the panel deprived plaintiff of due process in violation of the Fourteenth Amendment. Plaintiff alleges also that the decision of the panel and the defendant commission violates substantive provisions of the Telecommunications Act. Defendants maintain that the panel act-

ed properly. The form of compensation for handling local telephone traffic was properly before the panel and it could not have been decided without determining the nature of plaintiff's switch. According to defendants, plaintiff knew that the nature of its switch was subsumed by the issue of compensation rates; plaintiff raised the issue itself during the arbitration proceedings; and plaintiff failed to object when defendant Ameritech and the panel raised it themselves.

I conclude that defendants are entitled to summary judgment. By pricing plaintiff's switch at the end-office as opposed to the tandem. rate, neither the arbitration panel nor the defendant commission ran afoul of any substantive provisions of the Telecommunications Act. Quite the opposite, under the Telecommunications Act, the arbitration panel could not have produced a valid interconnection agreement covering compensation rates without determining the nature of plaintiff's switch. Plaintiff has failed to show that the arbitration panel deprived it of due process. The actions of plaintiff, the panel and defendants demonstrate that all parties understood that the characterization of plaintiff's switch was properly before the arbitration panel and was of vital importance to the selection of an appropriate form of compensation.

From the findings of fact properly proposed by the parties, I find that the following facts are not in dispute.

## UNDISPUTED FACTS

Plaintiff TCG is a Delaware corporation with offices in Staten Island, New York and Milwaukee, Wisconsin. Defendant Public Service Commission of Wisconsin is an agency of the State of Wisconsin. Defendant Ameritech is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.

Plaintiff is a "telecommunications carrier" within the meaning of § 3(49) of the Telecommunications Act of 1996. Defendant Public Service Commission has authorized plaintiff to provide local telephone exchange service in portions of southeastern Wisconsin, and plaintiff provides such service, mak-

ing it a "local exchange carrier" under the act. 47 U.S.C. § 153(44).

Like plaintiff, defendant Ameritech provides local exchange service in Wisconsin and is a "telecommunications carrier." Historically, defendant Ameritech has provided telephone exchange service in those portions of southeastern Wisconsin that overlap plaintiff's service area; for this reason, defendant Ameritech is considered an "incumbent local exchange carrier" under Section 251(h) of the act.

The Public Service Commission is a "State commission" under the act.

■ One of the purposes of the act is to promote competition between incumbent local exchange carriers like defendant Ameritech and other telecommunications companies, such as plaintiff, who are attempting to enter and compete for customers in local markets. Incumbent local exchange carriers are required to provide or allow interconnection of their established networks with the network of a competitor and are entitled to fair compensation.

■ An "interconnection agreement" under the act consists of detailed technological and monetary provisions that may be arrived at through voluntary negotiation. When negotiation fails, the act directs state regulatory agencies such as the defendant commission to provide mediation and arbitration services.

On February 8, 1996, Teleport Communications Group, Inc. notified defendant Ameritech on behalf of plaintiff that plaintiff wished to interconnect with defendant Ameritech's network and requested that the parties begin negotiating the terms and conditions for an interconnection agreement. Plaintiff and defendant Ameritech engaged in negotiations but were unable to reach a full agreement voluntarily. On July 17, 1996, plaintiff filed with the defendant commission a petition for arbitration to establish an interconnection agreement with defendant Ameritech. Plaintiff identified a number of issues for which it sought arbitration, including the appropriate form of compensation for transport and termination of local calls. Plaintiff identified other issues as well, such

as the appropriate compensation for switched access service, specific arrangements for interconnection and appropriate performance standards. On August 12, 1996, defendant Ameritech filed a response to the petition, stating that the parties had agreed on all but three issues: (1) the form of compensation for transport and termination of local calls on each party's network; (2) compensation for switched access service; and (3) appropriate performance standards. On September 20, 1996, plaintiff and defendant Ameritech filed a joint statement with the defendant commission, identifying resolved and unresolved issues between them.

Neither the petition for arbitration filed by plaintiff nor defendant Ameritech's response expressly identified the nature of plaintiffs switching mechanism as a separate issue for arbitration.

In March and April 1996, plaintiff and defendant Ameritech exchanged correspondence in which they argued about the treatment of plaintiffs switch in Illinois. Subsequently, plaintiff filed a petition for arbitration with the Illinois Commerce Commission on July 17, 1996. Plaintiff and defendant Ameritech agreed that the issues presented for the Illinois arbitration included "whether TCG's switch should be treated as a tandem switch for purposes of establishing transport and termination prices." In both the Illinois and Wisconsin proceedings, the parties agreed to arbitrate reciprocal compensation rates for local telephone traffic. Unlike the Wisconsin arbitration, in the Illinois proceeding plaintiff and defendant Ameritech assumed that it was likely that reciprocal compensation would be based on the Federal Communications Commission's proxy rates. They agreed that the nature of plaintiffs switch was the only issue left for arbitration. The Illinois Commission issued its opinion on November 4, 1996, finding in plaintiffs favor.

On October 10, 1996, a three-person arbitration panel appointed by the defendant commission held an "in camera" arbitration proceeding to resolve the disputed issues. Plaintiff and defendant Ameritech each had submitted prefiled testimony on October 4 in support of their respective positions. In a section of plaintiffs prefiled testimony, plaintiff asked itself: "Do TCG switches serve geographic areas comparable to the area served by an incumbent [local exchange carrier's] tandem switch?" Plaintiff answered "[a]bsolutely," and went on to explain why.

During the arbitration hearing the parties as well as members of the panel cross-examined witnesses. Plaintiffs expert witnesses, Ken Shulman and William Page Montgomery, referred repeatedly to plaintiffs switch as a tandem. At no time during their testimony did plaintiff object that the nature of plaintiffs switch was irrelevant to the issues before the panel. In response to questions asked by defendant Ameritech and a member of the panel, Shulman explained that plaintiffs switch should be characterized as a tandem because it provides the geographic coverage and functionality of a tandem switch. Shulman testified that fiber optic technology enables the switch operated by plaintiff to perform the functions and cover the geographic area of a conventional tandem switch. By contrast, he explained, defendant Ameritech's network architecture is based on the use of copper loops. Each loop or trunk is capable of serving no more than a three-mile radius. Individual loops terminate at and are connected to one another by "central office" hubs. Traffic between different loops and offices is controlled by means of two different switching mechanisms. A tandem switch directs incoming calls to the appropriate trunk route and the call is subsequently terminated on an end office switch. Thus, defendant Ameritech uses two switches to terminate a call while plaintiff uses only one. For this reason, Shulman characterized plaintiffs switch at one point as a "combination switch," although he referred to it throughout his testimony as a tandem switch.

Shulman agreed that defendant Ameritech is justified in receiving a higher rate for calls handled by its tandem switches because such calls are routed through two switches whereas transporting and terminating a call routed through an end office switch involves the use of a single switch. Plaintiff did not submit cost studies to show that the end office rate of termination is inadequate to reasonably compensate plaintiff for the costs incurred in

transporting and terminating calls through its switch. Shulman testified that plaintiffs network does not require it "to put lots of expensive switches down."

Montgomery stated that, "TCG would prefer to have its switch treated as a tandem." later in the hearing he testified that plaintiffs switch is an end office switch.

Plaintiff has one switch in the Milwaukee area. Plaintiffs system has no need for switch to switch routing within its network because this one switch serves plaintiffs entire geographic area and routes calls from an external switch to an end user. Plaintiffs expert testified that plaintiffs switch serves an area comparable to the area covered by about 31 of defendant Ameritech's end office switches. Defendant Ameritech's tandem switch in Milwaukee covers an area encompassing at least 79 (not 31) of its end office switches. This area extends from the Illinois state line on the south to as far north as Manitowoc, Wisconsin.

Although plaintiff and defendant Ameritech submitted reciprocal compensation proposals based on different accounting methods, the proposals of both parties set higher rates for calls routed through a tandem switch than an end office switch. Under plaintiffs "bill-and-keep" (i.e., payment in kind) proposal, each party would have terminated calls routed through the other's end office switches for fee, but would have paid to terminate calls routed through the other's tandem switch. During the hearing, Montgomery agreed that under such a scenario defendant Ameritech would have had to pay to terminate any call routed through plaintiffs one Wisconsin switch while plaintiff would have been able to terminate for free calls routed through any of defendant Ameritech's numerous end office switches. Defendant Ameritech's compensation proposal would require each party to pay the other cost-based rates for transporting and terminating calls routed through either or both types of switches.

After the arbitration hearing, on October 21, 1996, the panel sent plaintiff and defendant Ameritech a letter, directing them to address two additional issues in their post-hearing briefs: (1) the definition of a tandem

and (2) the characteristics of tandem switching that justify a separate rate. Both parties complied with this request without objection.

On November 8, 1996, the panel issued an arbitration award. The panel rejected plaintiffs bill-and-keep compensation proposal in favor of the cost-based method proposed, by defendant Ameritech. It set identical compensation rates for both parties for the transport and termination of local traffic. The rates for termination differed only with respect to whether terminations would take place at an end-office switch or through a tandem switch. The panel determined that the rate for end office termination would be $.003678 per minute. Tandem switch termination would be set at $.004422 per minute. The panel concluded that plaintiffs switch would be priced at the end office rather than the tandem rate.

On November 19, 1996, plaintiff and defendant Ameritech complied with the provision of the arbitration award directing both parties to submit joint contract language to the panel so that the interconnection agreement could be filed with the defendant commission for review pursuant to the act. Plaintiff filed a separate letter with the panel, expressing disapproval of the joint contract language to the extent that it contained provisions that were neither agreed upon by the parties nor adopted through the arbitration process. Plaintiff argued that inclusion of these disputed provisions meant that the joint contract language could not constitute an "agreement" submitted to the defendant commission for its approval or rejection pursuant to the act. The letter makes no mention of the panel's decision regarding plaintiffs switch. Despite plaintiffs objections, on December 23, 1996, the panel served the defendant commission with an interconnection agreement containing the joint contract language submitted by plaintiff and defendant Ameritech.

On January 10, 1997, plaintiff filed with the defendant commission written comments regarding the interconnection agreement, in which plaintiff argued that the arbitration panel improperly incorporated two provisions into the agreement because the issues had

not been resolved through either of the procedures established by the act: voluntary negotiation and arbitration. Plaintiff objected to the characterization of its switch by the panel as an end office switch. The second provision challenged by plaintiff involved a charge for the transport of communications traffic inserted in the schedule for reciprocal compensation. This was the first time plaintiff had raised any objection to the panel's consideration and resolution of the nature of plaintiffs switch. Plaintiff contended that because neither of these provisions had been voluntarily negotiated or properly placed before the arbitration panel, they were procedurally defective and the provision directing plaintiffs switch to be priced as an end office switch was substantively defective as well. Plaintiff requested that the defendant commission approve only the remaining provisions of the interconnection agreement. On January 22, 1997, the defendant commission issued a letter in which it affirmed the panel's decision regarding plaintiffs switch. However, the defendant commission rejected the interconnection agreement on the basis that the transport rate provision placed in the agreement had not been voluntarily negotiated and was not within the scope of the arbitration. After plaintiff and defendant Ameritech reached a voluntary agreement on the transport rate provision, the defendant commission approved the interconnection agreement on March 4, 1997. The approved form of the agreement contains the provision directing that plaintiffs switch be priced at the end office rate.

The agreement contains a dispute resolution mechanism that theoretically could be used to resolve any number of potential disputes, including the proper characterization of either party's switch.

## OPINION

### A. *Nature of Review*

Plaintiff brings this action under § 252(e)(6) of the Telecommunications Act, which provides only sparse guidance concerning the scope and standard of review to be applied by this court:

(6) REVIEW OF STATE COMMISSION ACTIONS. In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commissions actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section.

Generally, review proceedings are confined to the record created in the administrative agency. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985) (citing *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973)). The Supreme Court has held that when the statute in question provides for review but does not set forth the standards to be used or the procedures to be followed, "consideration is to be confined to the administrative record and [ ] no *de novo* proceeding may be held." *United States v. Carlo Bianchi & Company, Inc.,* 373 U.S. 709, 715–716, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963). Accordingly, review of the interconnection agreement between plaintiff and defendant Ameritech will be limited to the administrative record created before the arbitration panel and the defendant commission.

### B. *The Decisionmaking Process*

#### 1. The *Telecommunications Act*

The Federal Communications Commission issued a First Report and Order containing comprehensive rules regarding §§ 251 and 252 of the Telecommunications Act. *In the Matter of the Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* CC Docket No. 96–98. Several entities filed suit challenging these rules. On September 11, 1996, the Judicial Panel on Multidistrict litigation consolidated these petitions for review before the Court of Appeals for the Eighth Circuit pursuant to 28 U.S.C. 2112(a)(3). *In Re Federal Com-*

*munications Commission, Implementation of Local Competition Provisions in the Telecommunications Act* of 1996, J.P.M.L. Docket No. RTC–31. On October 15, 1996, the court of appeals granted a stay of the FCC's pricing rules. *Iowa Utilities Board v. Federal Communications Comm'n,* 109 F.3d 418 (8th Cir.1996), *motion to vacate stay denied,* —— U.S. ——, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996). Although the court of appeals left intact the balance of the First Report and Order, it vacated the pricing rules on the ground that the FCC lacked authority to promulgate them. *Iowa Utilities Board v. Federal Communications Comm'n,* 120 F.3d 753 (8th Cir.1997).

The Telecommunications Act provides for compulsory arbitration when parties are unable to reach full agreement through voluntary negotiation. Parties are directed to "petition a State commission to arbitrate any open issues." 47 U.S.C. § 252(b). In turn, the state commission "shall limit its consideration of any petition [for arbitration] to the issues set forth in the petition and in the response ..." 47 U.S.C. § 252(b)(4)(A). State commissions are directed to resolve issues placed before them "by imposing appropriate conditions as required to implement [the standards of arbitration] upon the parties to the agreement...." 47 U.S.C. § 252(b)(4)(B). The standards direct that when resolving open issues and imposing conditions upon the parties, the state commissions are to "establish any rates for interconnection, services or network elements according to [the act's pricing standards]." 47 U.S.C. § 252(c)(2). Under the act's pricing standards, charges for the transport and termination of local telephone traffic are "just and reasonable" so long as they are "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and [are] nondiscriminatory." 47 U.S.C. § 252(d)(2)(A)(i) and (ii). Rates may include a reasonable profit. 47 U.S.C. § 252(d)(2)(B).

In this case, the arbitration process took place before a panel appointed by the defendant commission. After the panel rendered its decision, the parties presented the interconnection agreement to the defendant commission for approval pursuant to 47 U.S.C. § 252(e). At this point in the negotiation process, the state commission must either approve the interconnection agreement, *id.,* or reject it if it is found (1) discriminatory; (2) inconsistent with the public interest, convenience or necessity; or (3) "not [to] meet the requirements of section 251, including ...." the [arbitration and pricing] standards. 47 U.S.C. § 252(e)(2)(A) and (B).

In the absence of a statutory provision defining what constitutes a valid interconnection agreement, the arbitration and pricing standards represent the guidelines for reviewing the decisions rendered by the panel and the defendant commission. Within this framework, the arbitration panel was limited to deciding issues set forth by the parties and was permitted to impose only those conditions necessary to conform to the arbitration and pricing standards. Similarly, the document presented for approval to the defendant commission could not constitute a valid interconnection agreement unless defendant commission found that the arbitration panel had complied with these same standards.

The heart of the dispute before this court is whether the nature of plaintiffs switch was a condition necessary to establishing "just and reasonable" compensation rates based on the cost of providing this service or whether the panel and defendant commission could have made a valid choice between the competing bill-and-keep and cost-based proposals presented by plaintiff and defendant Ameritech without determining how plaintiffs switch should be priced.

■ Parties able to negotiate a complete interconnection agreement without the assistance of a state commission avoid the expense and extra time inherent in arbitration, not to mention dissatisfaction with the outcome that often leads to further litigation. Voluntary negotiation is the preferred method of establishing an interconnection agreement under the act. Parties may resort to compulsory arbitration only after they are unable to come to terms on their own. Indeed, the first requirement imposed

on parties petitioning for arbitration is to identify what matters stand in the way of a finished, functioning agreement. Parties must separate resolved from unresolved issues and articulate their respective positions on matters under contention. 47 U.S.C. § 252(b). Although state commissions are limited to deciding issues set forth by the parties, competing provisions require them to resolve fundamental elements necessary to make an interconnection agreement a working document. For example, under the act's arbitration and pricing standards, state commissions "shall" establish rates for interconnection. 47 U.S.C. § 252(c). Thus, state commissions are accorded considerable latitude to resolve issues within the compass of the pricing and arbitration standards, even if these matters are not specifically identified by parties as open issues in their petitions for arbitration. An issue as broad and important to an interconnection agreement as what parties will charge one another necessarily will include sub-issues that must be addressed by the arbitration panel in order to decide the larger matter. This is a common sense notion. That state commissions possess wider discretion under the act to determine rates for interconnection-related services reflects an understanding that parties are least likely to resolve this issue without third-party assistance, that compulsory arbitration is reserved primarily for this purpose, and that the considerable public and private resources invested in arbitrating agreement provisions would be squandered if compensation-related issues were left unresolved. Compulsory arbitration is intended to represent the final stage in completing an interconnection agreement, as opposed to one of many stops along the road. The act's drafters intended that at the very least proceedings before a state commission would settle what parties to an agreement will charge one another for interconnection services, if they did not produce a complete interconnection agreement.

■ The Telecommunications Act does not recognize the subtle abstraction advanced by plaintiff that "[t]he issue before the Panel was a rate *level* issue, not a rate *application* issue." Plaintiffs brief at 14–15. Under the act, not only must the defendant commission

establish rate levels, it must insure that the levels are just, reasonable and nondiscriminatory. The nature of plaintiffs switch was of considerable financial significance under both the rate-based and bill-and-keep compensation proposals because calls are more expensive to route through a tandem than an end-office switch. Given this, the panel and the defendant commission could not have complied with the pricing standards, which included an obligation to make a "reasonable approximation of the additional costs of terminating [calls that originate on the network facilities of the other carrier]," 47 U.S.C. § 252(d)(2)(A)(ii), without determining the nature of plaintiffs switch. Therefore, as a matter of law, the arbitration panel and the defendant commission could not determine the form of reciprocal compensation and abide by the pricing standards without also determining the nature of plaintiffs switch.

■ Even if the petition and response to the petition for arbitration did not properly place the nature of plaintiffs switch before the panel and even if the act did not require the panel to determine this issue in order to set reciprocal compensation costs, subsequent events cure this defect. Plaintiff and defendant Ameritech each argue what, if anything, the arbitration that took place before the Illinois Commerce Commission in 1996 signifies regarding whether the nature of plaintiff's switch was properly at issue in the Wisconsin proceedings. Defendant Ameritech contends that the parties explicitly presented this issue for resolution in Illinois only because they had settled through voluntary negotiation every other matter related to reciprocal compensation. They had assumed for the purpose of the Illinois arbitration that compensation would be based on the Federal Communications Commission's proxy rates. No such stipulation or assumption was made for the proceedings underlying this case. Quite the opposite, plaintiff and defendant Ameritech each invested considerable effort debating the merits of cost-based versus bill-and-keep forms of compensation. Defendant Ameritech seems to suggest that the parties would not have identified the nature of plaintiffs switch as a discrete issue had the form of compen-

sation not been settled beforehand. Instead, as in the Wisconsin proceedings, they would have agreed that the form of reciprocal compensation should be arbitrated and assumed that this issue encompassed the nature of plaintiffs Illinois switch. Perhaps defendant Ameritech is correct, but there is no way of verifying this assertion. It does, however, demonstrate that the defendant commission could not fulfill its statutory obligation to establish compensation rates without determining both the form of compensation and the nature of plaintiffs switch. Plaintiff insists that because the issue was clearly identified in the petition submitted to the Illinois Commerce Commission, omitting it from in the petition filed with the defendant commission proves that neither party contemplated that the nature of plaintiff's switch would be determined. In other words, the petition for arbitration and defendant Ameritech's response should be taken at face value; no assumptions based on extrinsic matters should be read into them, particularly when both parties agree that significant financial consequences attach to whether plaintiffs switch is priced at the end-office or tandem rate. Plaintiff is correct. At the outset of compulsory arbitration the *parties* determine what issues will be resolved through arbitration, not the state commissions.

Events following the appointment of an arbitration panel by a state commission can alter the scope of matters under consideration. In this case, plaintiff submitted direct testimony before the arbitration hearing began in which it consistently referred to its switch as a tandem switch. Plaintiff asked itself: "Do TCG switches serve geographic areas comparable to the area served by an incumbent [local exchange carrier's] tandem switch?" Plaintiff answered "[a]bsolutely," and went on to explain why. A Federal Communications Commission regulation, stayed at the time, mandated that rates for transport and termination of local calls be set according to the following standard:

> Where the switch of a carrier other than an incumbent LEC serves a geographic *area* comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an

incumbent LEC is the incumbent LEC's tandem interconnection rate.

47 C.F.R. § 51.711(a)(3) (*vacated by Iowa Utilities Board v. Federal Communications Commission,* 120 F.3d 753.) Plaintiff cannot voluntarily ask and affirmatively answer a question that mirrors word-for-word a standard regarding the distinguishing characteristics of tandem and end-office switches while simultaneously maintaining that the nature of its switch had not been raised and had no relevance to the proceedings.

That the issue arose numerous times during the arbitration hearing and again after the hearing concluded renders plaintiffs position even less tenable. Both Shulman and Montgomery referred repeatedly to plaintiffs switch as a tandem. In response to questions asked by the panel and defendant Ameritech, Shulman explained why plaintiff's switch should be characterized as a tandem and not an end-office switch. Montgomery agreed that adoption of the bill-and-keep proposal would mean that, unlike plaintiff, defendant Ameritech would not be compensated financially for terminating calls originating on plaintiffs network so long as plaintiffs switch was priced as a tandem. Montgomery added that "TCG would prefer to have its switch treated as a tandem." Both parties complied with the panel's request to address in their post-hearing briefs the defining characteristics of a tandem switch and why calls routed through a tandem should be billed at a higher rate. Plaintiff wrote to the panel protesting various aspects of the arbitration decision. Given that plaintiff failed to object on any of these occasions that the nature of its switch was not properly before the panel, the surprise expressed by plaintiff in its letter to the defendant commission rings hollow.

### 2. *Procedural Due Process*

The Fourteenth Amendment of the United States Constitution provides that "No State shall ... deprive any person of life, liberty, or property, without due process of law...." The amendment's due process clause has come to embody two related, but distinct concepts: procedural due process and sub-

stantive due process. Procedural due process guarantees that before a state deprives an individual of life, liberty or property, it must afford that individual a fair decision-making process. Procedural due process is unconcerned with outcomes: as long as fair decisionmaking processes are offered, procedural due process is satisfied.

■■■ A plaintiff asserting a violation of the right to procedural due process must first allege it has a constitutionally protected property or liberty interest at stake. *See New Burnham Prairie Homes v. Village of Burnham,* 910 F.2d 1474, 1479 (7th Cir.1990) ("Before a party may assert a due process argument—procedural or substantive—it must establish that it has a 'legitimate claim of entitlement' to the right being asserted.") (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972)); *see also Zorzi v. County of Putnam,* 30 F.3d 885, 894 (7th Cir.1994) (absence of claim by plaintiff that "an interest in liberty or property has been impaired is a fatal defect" in due process claim). A property interest is created by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *see also Cushing v. City of Chicago,* 3 F.3d 1156, 1159–60 (7th Cir.1993). As the court of appeals observed in *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir. 1983), "property is what is securely and durably yours under state . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." Liberty interests may flow directly from the Fourteenth Amendment or, like property interests, be created by state law. *Polenz v. Parrott,* 883 F.2d 551, 555 (7th Cir.1989). Plaintiffs overlook this fundamental requirement.

■■■ It may be that plaintiff is contending that the applicable state or federal regulations confer upon it a property or liberty interest in how its switch is characterized, but its allegations do not support this contention. In order to create a liberty or property interest, a regulation must contain " 'explicitly mandatory language,' i.e., specific directives to the decision maker that if the regulations' substantive predicates are present, a particular outcome must follow." *Hohmeier v. Leyden Community High Schools District 212,* 954 F.2d 461, 466 (7th Cir.1992) (citing *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989)). Plaintiff does not direct the court to the relevant Public Service Commission regulations or allege that those regulations impose a mandatory and binding obligation on the defendant commission. Plaintiff does cite 47 C.F.R. § 51.711(a)(3) which might have provided an adequate basis to establish a property interest in the characterization of its switch had the Court of Appeals for the Eighth Circuit not stayed and then vacated this regulation in *Iowa Utilities.*

### C. *The Arbitration Decision*

Plaintiff argues that the decision rendered by the defendant commission runs afoul of the Telecommunications Act because it is unsupported by the record, violates the act's standards of just, reasonable and nondiscriminatory pricing and undermines the act's pro-competitive goals. Challenges to an administrative agency's decisionmaking are governed by the Wisconsin Administrative Procedure Act. Wis. Stat. § 227.57. Discretionary decisions and factual findings are scrutinized under different tests, each of which must be satisfied whenever agency actions are reviewed under Wis. Stat. § 227.57. *Westring v. James,* 71 Wis.2d 462, 238 N.W.2d 695 (1976).

■■■ An agency's factual findings are reviewed pursuant to the so-called "substantial evidence" test found in Wis. Stat. § 227.57(6), which requires a court to "set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record." The substantial evidence test is satisfied when reasonable minds could arrive at the same conclusion as the defendant commission after taking into account all evidence in the record. *Madison Gas & Electric v. Public Service Comm'n of Wisconsin,* 109 Wis.2d 127, 133, 325 N.W.2d 339, 342–43

(1982). The court does not judge the credibility of witnesses or weigh the evidence. *Shoreline Park Preservation, Inc. v. Wisconsin Dept. of Admin.,* 195 Wis.2d 750, 761, 537 N.W.2d 388, 391–92 (Ct.App.1995). The agency's findings will be set aside only if a reasonable person could not have made the findings from the evidence. *Daly v. Natural Resources Bd.,* 60 Wis.2d 208, 220, 208 N.W.2d 839, 846 (1973), *cert. denied,* 414 U.S. 1137, 94 S.Ct. 883, 38 L.Ed.2d 763 (1974),

■■■ Discretionary agency decisions are reviewed under an arbitrary and capricious standard, rooted in Wis. Stat. § 227.57(8). When applying this standard, a reviewing court determines whether the agency's actions had a rational basis, not whether the agency acted on the basis of factual findings. *J.F. Ahern Co. v. Wisconsin State Bldg. Comm'n,* 114 Wis.2d 69, 96, 336 N.W.2d 679, 692 (Ct.App.1983), *review denied,* 71 Wis.2d 46, 237 N.W.2d 183. When inquiring whether an agency has abused its discretion by making an arbitrary and capricious decision, a court may not substitute its judgment for that of the agency. *Wisconsin Prof. Police Assoc. v. Public Service Comm'n of Wisconsin,* 205 Wis.2d 60, 74 555 N.W.2d 179, 186 (Ct.App.1996).

■■■ The panel made a factual finding that plaintiffs switch functions like an end office switch. Contrary to plaintiffs assertion, evidence adduced on this issue in the course of arbitration proceedings was not limited solely to the portion of Shulman's testimony in which he states that plaintiffs switch performs both an end office and a tandem function. Shulman explained in response to questioning from the panel that plaintiffs switch operates like an end office switch because it accepts calls from an external switch and routes them to its customers. He agreed that in terms of functionality there was no difference between plaintiffs switch and defendant Ameritech's end office switches. Shulman agreed under cross-examination that calls terminated on plaintiffs network require the use of only one switch, while defendant Ameritech's tandem switches the same calls twice. Both plaintiff and defendant Ameritech addressed the characteristics of tandem and end office switching in

their post-hearing briefs. From this evidence, a reasonable person could conclude, as the panel did, that plaintiffs switch functions like an end office switch.

■■■ That plaintiffs switch should be priced as an end office and not a tandem switch is informed by broader considerations than functionality. Advances in telecommunications have rendered nearly obsolete the categorical distinction implied by "tandem" and "end office." These terms originate in an older generation of technology and do not accurately describe the roles played by switches in a fiber optics network. Testimony during the arbitration hearing demonstrated this problem vividly. Expert witnesses and panel members struggled with the terminology and definitions. In order to make sense of this situation, the panel necessarily needed to rely on a variety of complex, discretionary matters that go to the ultimate issue of establishing a just, reasonable and nondiscriminatory form of compensation. For this reason, the lengthy and detailed treatment of the form of compensation set out in the award should not be read in isolation from the panel's discussion of plaintiffs switch. Even so read, the panel's reasoning still has a rational basis. The panel compared the functionality of plaintiffs switch with the definition of a tandem switch set forth in a portion of the Federal Communications Commission's First Report and Order not affected by the *Iowa Utilities* cases. Plaintiff cites as authority the FCC regulation directing state commissions to price a local exchange carrier's switch at the tandem rate if its switch serves a geographic area comparable to the area served by an incumbent local exchange carrier. It is true that the panel's decision makes no mention of evidence in the record regarding the comparative geographic coverage of the parties' switches. Yet plaintiff neglects to mention that the court of appeals had imposed a stay on this regulation at the time arbitration was pending before the defendant commission. Failure to consider a standard that had no legal status during the decisionmaking process cannot constitute an arbitrary or capricious act.

Plaintiff argues that the arbitration award violates the act's standards of just, reasonable and nondiscriminatory pricing as well as undermines the act's pro-competitive goals. Both contentions are based on the same premise: the panel had no rational basis to price plaintiffs switch at the end office rate. Plaintiff reasons that because its switch performs the same functions as defendant Ameritech's tandem switch and serves a comparable geographic area both parties should be compensated at the same rate. The record before the defendant commission could support such a conclusion. However, a court's role in reviewing matters committed to agency discretion is limited to determining whether the agency's decision was arbitrary and capricious; once it determines it is not, the court is prohibited from substituting its judgment for that of the agency. I have determined that substantial evidence exists to support the panel's finding that plaintiff's switch performs the functions of an end office switch. The decision to price plaintiffs switch at a lower rate would have no rational basis in the context of the act's pricing and pro-competitive standards if the record was lacking in any indication why this disparity was justified. The record is not lacking. It crosses the rational basis threshold, establishing that it is more expensive to route a call through two switches than one, that calls terminated on plaintiff's network are switched only once and that calls handled by defendant Ameritech's tandem switch are switched twice.

#### D.  *Conclusion*

The nature of plaintiffs switch was properly before the arbitration panel and defendant commission because, under the Telecommunications Act, reciprocal compensation rates for local telephone traffic could not be established without a determination of the pricing of plaintiffs switch. Even if, as a matter of law, the panel were not required to decide the nature of plaintiffs switch, the parties made this matter an issue during the arbitration proceedings. Plaintiff did not object during the hearing when defendant Ameritech and the panel elicited testimony regarding whether plaintiffs switch should be characterized as an end office or a tandem switch and explored the corresponding implications

of each possibility. Indeed, plaintiff submitted prefiled testimony in which it argued that its switch "absolutely" covers a geographic area comparable to the area served by defendant Ameritech's tandem switch. It is not a coincidence that this statement mirrors an FCC regulation that would have required the defendant commission to price plaintiffs switch at the tandem rate if plaintiffs assertion about geographic coverage were correct and if the regulation had not been stayed by the court of appeals. Because plaintiff does not have a protected liberty or property interest in assuring its switch is priced at the tandem rate, the defendant commission and the arbitration panel did not deprive plaintiff of due process in violation of the Fourteenth Amendment. Finally, approval of the arbitration award by the defendant commission was not an arbitrary and capricious act. The award does not run afoul of the Telecommunications Act's pricing or pro-competitive standards because the panel's decision is supported by substantial evidence and a rational basis.

#### ORDER

IT IS ORDERED that plaintiffs motion for summary judgment is DENIED and the motion of defendant Ameritech for summary judgment is GRANTED. The clerk of the court is ordered to enter judgment for defendants Ameritech and Public Service Commission of Wisconsin and close this case.