# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3901

_____

Watkins Incorporated,

                Appellee,

v.

Lloyd M. Lewis and
Sandra G. Lewis,

                Appellants.

On Appeal from the United States
District Court for the District
of Minnesota

_____

Submitted: June 13, 2003
Filed: October 21, 2003

_____

Before RILEY, HEANEY, Circuit Judges, and ERICKSEN,[1] District Judge.

_____

ERICKSEN, District Judge.

      Sandra and Lloyd Lewis sought a preliminary injunction after Watkins Incorporated ended the parties' long-standing business relationship. The district

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

court[2] denied the injunction, finding that the Lewises had not met their burden on any of the four Dataphase factors, and this appeal followed. We affirm.

Watkins is a direct-selling organization that sells health care products, food items, lotions, and various household products. In 1982 the Lewises signed a Purchase Agreement with Watkins whereby they became self-employed dealers in merchandise sold by Watkins. The Agreement provided that it could be terminated at any time by giving written notice. After they signed the Agreement, the Lewises began selling Watkins products in the southeastern United States. Unlike most self-employed Watkins dealers, the Lewises targeted their sales efforts at small retail establishments as opposed to individual consumers.

Ten years later, in December 1992, Watkins changed its policy with respect to sales to retail establishments. It issued a "Location Selling Policy" that provided as follows:

> **Do not sell Watkins products at self-service retail locations.** Watkins products may be sold from locations such as trade shows, fairs, and mall kiosks provided the location is operated by and the sale is transacted by a registered Watkins Marketing Representative/Director.
>
> Watkins products may not be displayed or sold in self-service retail locations. (Note: Display and sales may continue at all retail locations which were in operation and have been registered with the company prior to 12/15/92. The accounts and locations are not transferable.)

In 1997, the Lewises signed an "Agreement to Comply with All Watkins Policies and Procedures," in which they verified that they would "comply with and follow all of Watkins' policies and guidelines as set forth in the terms and conditions

---

[2]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

of the International Marketing Representative Agreement and Watkins Training/Reference Manual." To resolve a dispute regarding the Location Selling Policy, the parties entered into an agreement (Settlement Agreement) in 1998 to "clarify their independent contractor relationship with one another." The Lewises furnished to Watkins a list of retail establishments that were grandfathered-in under the Location Selling Policy. Watkins agreed that:

> The Lewises and their daughter Brittany and any spouse of Brittany are entitled to continue to distribute [specified Watkins products] through such Business Locations under said Location Selling Policy until the businesses located on [the list] no longer operate at the Business Location specified [on the list] or until they die or until further agreement of the parties.

Watkins and the Lewises further agreed "to communicate with each other on a professional basis and . . . to work with each other in a manner consistent with the Watkins' Rules of Conduct in order to increase their respective businesses."

Difficulties in the business relationship between the parties became evident in early 2002. A Watkins representative visited the Lewises, who perceived that the representative was not impressed with their sales abilities. Watkins was slow to respond to the Lewises' complaint that other Watkins associates were selling to retail establishments on the Lewises' list. Watkins discovered that the Lewises were selling to unauthorized retail store locations, and Watkins' customer service representatives received an increasing number of complaints about the Lewises. The complaints related to overcharges, failure to deliver paid-for product, and concerns about professionalism. In April 2002, a Watkins representative wrote to the Lewises, warning them about their various perceived failings and cautioning that "any future unprofessional behavior and violation of our policies and procedures will not be tolerated and may result in the cancellation of your Watkins contract." Matters did not improve through the summer. Watkins' Teleservices Manager continued to report

complaints about overcharges and lack of delivery. In July, Watkins was notified of an impending $300,000 lawsuit arising out of the Lewises' dealings with a customer.

On September 11, 2002, Watkins notified the Lewises that, effective immediately, their contract and membership with Watkins were terminated: "The basis for this termination is multiple and continuing breaches of the Purchase Agreement you signed, as well as multiple and continuing breaches of the Agreement you signed on December 12, 1998, and for continuing violation of our Rules of Conduct as stated in our Policies and Procedures Manual." A week later, Watkins sent a letter to store managers and owners informing them that the only Watkins representative authorized to sell or service stores in their area was FitzGibbon and Company. Watkins also sent letters to its associates and managers notifying them that Sandy and Mike Lewis were "no longer Watkins Independent Associates," and that they should contact Cecilia and Myron Smith in Clarksville, Georgia, for support.

Contemporaneous with its termination of the Lewises' distributorship, Watkins sued the Lewises in state court, alleging that they had breached two agreements. The Lewises removed the lawsuit to federal district court on September 25, 2002, and on October 2, 2002, they filed a counterclaim alleging that they, their daughter, and any spouse she might acquire had a lifetime contract to sell Watkins products. On October 3, 2002, they moved for a preliminary injunction. The order denying them injunctive relief was issued on October 11, 2002.

I.    **Discussion**

In deciding a motion for a preliminary injunction, a district court balances four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). A

-4-

preliminary injunction is an extraordinary remedy, see Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc., 815 F.2d 500, 503 (8th Cir. 1987), and the burden of establishing the propriety of an injunction is on the movant, Geoff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995). We review for abuse of discretion. See Dataphase, 640 F.2d at 114.

The party seeking injunctive relief bears the burden of proving all the Dataphase factors. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987). The parties hotly dispute whether the district court abused its discretion in determining that the Lewises failed to demonstrate a probability of success on the merits of their claim. We will assume, for purposes of this appeal, that this question provides "fair ground for litigation," see Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 916 (2d Cir. 1986), and turn to the district court's conclusion that the Lewises failed to demonstrate a threat of irreparable harm.

Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction. See Adam-Mellang v. Apartment Search, Inc., 96 F.3d 297, 299 (8th Cir. 1996); Gelco, 811 F.2d at 420. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). When there is an adequate remedy at law, a preliminary injunction is not appropriate. Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989).

The Lewises assert that their situation is analogous to cases in which preliminary injunctive relief has been granted. The Lewises direct our attention to Iowa Utilities Board v. Federal Communications Commission, 109 F.3d 418 (8th Cir. 1996), Ryko Manufacturing Co. v. Eden Services, 759 F.2d 671 (8th Cir. 1985), and Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970). Watkins

stresses factual distinctions from those cases and cites additional authority including <u>Loveridge</u>.

In <u>Iowa Utilities Board</u>, we granted a stay of local competition pricing rules pending judicial review of the report and order of the Federal Communications Commission implementing local telephone competition provisions of the Telecommunications Act of 1996. 109 F.3d at 421. We found that the FCC had most likely exceeded its authority in promulgating intrastate pricing regulations. <u>Id.</u> at 423-25. We also found that the regulations would have permanent effects on on-going negotiations with local exchange carriers (LECs), <u>id.</u> at 425-26, and would give rise to irreparable harm because "the incumbent LECs would not be able to bring a lawsuit to recover their undue economic losses if the FCC's rules are eventually overturned, and we believe that the incumbent LECs would be unable to fully recover such losses merely through their participation in the market," <u>id.</u> at 426.

<u>Ryko</u> concerned a dispute between a manufacturer of car wash equipment and one of its exclusive distributors. 759 F.2d at 671. We held that the district court did not abuse its discretion in enjoining the manufacturer from terminating the distributorship contract. <u>Id.</u> at 673. The district court had found that the distributor would be unable to finance the litigation without the injunction and that the public had a possible interest in having the distributor, a small business, continue its business and litigate its antitrust claims against the manufacturer. <u>Id.</u> The manufacturer, by contrast, could be compensated by money damages for any losses it suffered as a result of the distributor's alleged promotions or sales of unauthorized products. <u>Id.</u>

In <u>Semmes</u>, the Second Circuit affirmed a temporary injunction prohibiting Ford Motor Company from terminating Semmes Motors, Inc.'s automobile dealership. 429 F.2d at 1199. The court observed that termination of a 20-year

business could not be measured entirely in monetary terms.  Id. at 1205.  This was balanced against the harm to Ford, which was relatively small:

> As against this, the hardship to Ford in continuing the Semmes dealership pendente lite was relatively small.  Ford makes no claim that Semmes has not adequately represented it in the lucrative Scarsdale market, and the record indicates that the submission of false claims has been greatly reduced, if not eliminated.

Id.  The decision was strictly limited to the facts of the case:  "We read the opinion as strictly limited to the facts of this case; any dealer who regards it as a Magna Carta for cheating Ford or any other manufacturer does so at his peril."  Id.

In Loveridge, the Second Circuit held that the district court abused its discretion in granting a preliminary injunction that prevented Pendleton Woolen Mills, Inc. from terminating a sales representative's contract.  788 F.2d at 916.  The court distinguished the contract from a dealership agreement:

> Unlike a dealership that builds up good will and a reputation for reliability, totally distinct from that of the manufacturer, [the sales representative's] good will was tied exclusively to his ability to convince his customers of the quality of [Pendleton Woolen Mills'] woolen products.  This is significantly different from the dealer whose customers will begin to "grumble" and go elsewhere if the dealer no longer carries a certain product because the manufacturer has terminated the dealership's contract.

Id. at 917.

We are convinced that the situation in Loveridge is most comparable.  As with that contract, the value of a Watkins membership depends significantly upon the salesman's ability to convince customers of the quality of the Watkins products.  It appears that Watkins controls whether retail establishments – in general – may sell

its products, and if they may sell, which authorized Watkins associate they must deal with. When, rightly or wrongly, it terminated the Lewises, Watkins "assigned" FitzGibbon. Presumably it could reassign the Lewises (Lloyd, Sandra, Brittany, or the as yet unknown spouse of Brittany) if necessary. In that event the Lewises would be restored to their pre-termination status vis-à-vis the establishments on the "list." We do not assume that the transitions would have no effect on the profitability of what might be termed the Lewises' "territory." However, "such a loss would be compensable in money damages. Such loss is no different from the loss that any commissioned salesman would sustain upon termination." Id.

In addition to the harm they allege they have suffered as a result of not being able to sell to their retail customers, the Lewises allege more generally that their customer relationships are being irreparably harmed and that their goodwill is being permanently diminished. The district court found that their proof of harm in this regard was insufficient. The court found that only one customer was identified. The others were described in such general terms that the district court was unable to assess whether the Lewises were being irreparably harmed in their ability to sell to these businesses. For example, they complained that "they have been receiving many telephone calls from customers asking what is going on and seeking to order product" and "are not able to address the customer's concerns because they do not know the factual reasons supporting Watkins' alleged 'termination' of them." They also asserted that "customers [neither identified nor quantified] have expressed shock and raised questions about why [the Lewises] were terminated which is prejudicing the Lewises whether they sell Watkins product or any other product," and that "[c]ertain customers who previously called the Lewises every day have not called since soon after the Watkins' letters were sent." The Lewises argue that the court was mistaken as to certain key facts. For example, they acknowledge that the quantity of customer telephone calls was not definite in Sandy Lewis's affidavit, but "it is undisputed that the Lewises lost 2100 retail store purchasers of Watkins products." Appellant Br. at 39. We are satisfied that the district court adequately apprehended the record.

Having reviewed the case law upon which the parties rely and considered the record presented to the district court, we conclude that the district court did not abuse its discretion in finding that the Lewises had failed to establish a threat of irreparable harm.

The Lewises sought injunctive relief on their two Minnesota statutory claims as well. They have not raised the Minnesota Trade Secrets Act claim in this appeal. With respect to the Minnesota Deceptive Trade Practices Act claim we note that the Minnesota Court of Appeals has held that the Act does not permit private suits for damages, but only injunctive relief. Dennis Simmons D.D.S., P.A. v. Modern Aero, Inc., 603 N.W.2d 336, 339 (Minn. App. 1999). The Act is intended to protect persons who are likely to be damaged by deceptive trade practices such as passing off goods or services as those of another, misrepresenting the standard, quality, or grade of a goods, or other conduct that similarly creates a likelihood of confusion or misunderstanding. See Minn. Stat. § 325D.44, subd. 1; Simmons, 603 N.W.2d at 339. The statute does, as the Lewises point out, permit relief against deceptive trade practices regardless of damages or other remedies available at law, Minn. Stat. § 325D.45, subd. 1, 3. Relief under the statute is to be granted a courts' discretion "under the principles of equity." Id. § 325D.45, subd. 1. In this case, if Watkins engaged in a deceptive trade practice by announcing to its customers that the Lewises are no longer authorized dealers, it is the Lewises who are harmed. They, as we have observed, have an adequate remedy at law. We are not persuaded that the existence of the Minnesota Deceptive Trade Practices Act compels the granting of a preliminary injunction in this private contract dispute, if it would not otherwise be required.

The district court did not abuse its discretion in denying the preliminary injunction.

The judgment of the district court is AFFIRMED.

_____