**BOSTON SCIENTIFIC CORPORATION,**
Plaintiff,

v.

**Mary Evelyn DUBERG and Medtronic, Inc., Defendants.**

Civ. No. 10–4525 (RHK/SRN).

United States District Court,
D. Minnesota.

Nov. 24, 2010.

Robert L. Schnell, Jr., Christina C. Semmer, Faegre & Benson LLP, Minneapolis, MN, for Plaintiff.

William Z. Pentelovich, Wayne S. Moskowitz, Maslon Edelman Borman & Brand, Minneapolis, MN, for Defendants.

## MEMORANDUM OPINION AND ORDER FOR PRELIMINARY INJUNCTION

RICHARD H. KYLE, District Judge.

### INTRODUCTION

Plaintiff Boston Scientific Corporation ("Boston Scientific") has sued its former employee, Mary Evelyn Duberg, and Duberg's new employer, Medtronic, Inc. ("Medtronic"), to enforce a non-competition clause in Duberg's employment agreement. Boston Scientific also asserts a claim against Medtronic for tortious interference with contractual relations. Before the Court is Boston Scientific's Motion for a Temporary Restraining Order. Because the Defendants have received notice and the Motion has been fully briefed, the Court will treat it as a Motion for a Preliminary Injunction. Oral arguments were heard on November 23, 2010. For the reasons set forth below, the Court will grant the Motion.[1]

---

1. The following constitutes the Court's findings of fact and conclusions of law, as required by Federal Rules of Civil Procedure 52(a) and 65.

## BACKGROUND

Duberg began working as a medical device sales representative for Guidant Sales Corporation (GSC), a wholly-owned subsidiary of Boston Scientific, in 2006. As a condition of her employment, she signed a noncompete agreement. In 2008, the identity of Duberg's employer changed from GSC to Boston Scientific, and she was offered (and accepted) a sales-representative position with Boston Scientific. Her job title and the identity of her employer changed, but she continued doing the same work in the same region (in and around Grand Rapids, Michigan). In connection with this change, and as a condition of her employment with Boston Scientific, she signed a new employment agreement and a new noncompete agreement on April 25, 2008.[2] The 2008 noncompete agreement superseded the prior agreement and controls the present dispute.

The noncompete agreement between Duberg and Boston Scientific provides:

> During the term of employment and for a period of three hundred sixty five (365) days following the termination of employment with [Boston Scientific][3] for any reason, [Duberg] shall not *sell, solicit the sale of, support the sale of, support or supervise the sale or implantation or other use of, or otherwise have any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any **Competitive Product** with respect to any* [Boston Scientific] Account. It is expressly understood that

> [Duberg] may be employed by a competitor of [Boston Scientific] during the three hundred sixty five (365) days following termination so long as such employment does not involve the prohibited actions specified above.
>
> * * *
>
> The restrictions contained [above] shall apply regardless of whether Duberg acts directly or indirectly.

(Declaration of Mary Evelyn Duberg ("Duberg Decl.") Ex. C § 3 (emphasis added).)

Notably, the agreement applies only to "Competitive Products," which are defined as another company's products which "perform[ ] similar functions or [are] used for the same general purposes as a CPI Product." (*Id.* § 2(a).) The meaning of "Competitive Product" thus turns on the agreement's definition of a "CPI Product," which is:

> any product, product line or service that has been designed, developed, manufactured, marketed or sold by CPI[4] or regarding which CPI has conducted or acquired research and development. Such products include, but are not limited to, cardiac pacemakers, implantable defibrillators, products which are the functional equivalent of cardiac pacemakers or implantable defibrillators, resynchronization devices, and leads, programmers and other devices ancillary to cardiac pacemakers, implantable defibrillators, or resynchronization devices.

(*Id.* § 2(d).) Additionally, to be considered a "Competitive Product," Duberg must

---

**2.** Medtronic makes much of the fact that Boston Scientific relies upon the original 2006 noncompete agreement, rather than the 2008 agreement which superseded it. However, as both sides acknowledged at oral argument, the relevant provisions and definitions in both agreements are *identical*; thus, the issues remain the same.

**3.** The 2008 noncompete agreement still refers to "GSC" as the employer, and to "GSC Accounts." The Court has changed these references for "Boston Scientific" to avoid confusion.

**4.** "CPI" refers to Cardiac Pacemakers, Inc. or any successor organization of CPI. (Duberg Decl. Ex. C § 2(c).) Guidant and Boston Scientific sold CPI products.

have "sold, solicited the sale of, supported the sale of, supported or supervised the implantation or other use of" the product or "participated in [its] research and development, clinical testing or engineering" during the twelve months prior to leaving Boston Scientific. (*Id.* § 2(a).)

The noncompete agreement restricts Duberg from performing any of the restricted activities involving competitive products with respect to "[Boston Scientific] Accounts," which are defined to include:

> Those physicians, hospitals, clinics, and other persons and entities to whom or for whom, [Duberg] ... sold, solicited the sale of, supported or supervised the sale of, or supported or supervised the implantation or other use of any CPI Product during the twelve (12) months immediately preceding the termination of [Duberg]'s [Boston Scientific] employment. "[Boston Scientific] Account" includes not only the persons and entities themselves, but also those employees, agents, or other affiliated persons involved in the purchase, implantation, or use of any CPI Product.

(*Id.* § 2(e).)

While working for Boston Scientific, Duberg sold cardiac rhythm management ("CRM") devices, including pacemakers, implantable defibrillators, and cardiac resynchronization therapy defibrillators. CRM devices provide therapy and are used to treat various heart rhythm disorders. (Declaration of Scott Berens ("Berens Decl.") ¶¶ 2–3; Declaration of Brad Keller ("Keller Decl.") ¶ 4.) The technology involved in CRM devices is complex, and the market for them is very competitive; thus, sales representatives must have significant technical and clinical knowledge. (Berens Decl. ¶ 6.) Sales representatives like Duberg are often in the operating room when CRM devices are implanted, providing technical assistance to physicians during implantation procedures. (*Id.*) Boston Scientific and other medical device companies invest extensive time, effort, and expense in training their CRM sales representatives. (*Id.* ¶ 7.) The principal customers for CRM devices are doctors, and the relationships between sales representatives and doctors are critical to a medical device company's success. (*Id.* ¶ 8.) When a successful sales representative leaves Boston Scientific, the company often loses sales in the accounts that representative served. (*Id.*)

Also at issue is a device known as an insertable loop recorder ("ILR"). An ILR is an electronic diagnostic device that is implanted into a patient's chest. (Berens Decl. ¶ 4.) It monitors and records the electronic activity of the patient's heart and is most commonly used with patients suffering from undiagnosed fainting spells. (*Id.*; Keller Decl. ¶¶ 3–4.) An ILR can assist a physician in determining whether fainting spells are being caused by heart rhythm disorders; if they are, the disorder is usually treated with a pacemaker or other CRM device. (Berens Decl. ¶ 4.)

Boston Scientific does not manufacture ILRs. (Keller Decl. ¶ 5.) For part of 2009, it tested a pilot program to create sales leads for an ILR manufactured by Transoma Medical. As part of this program, Duberg made two referrals that led to ILR sales by Transoma at Hurley Medical Center. She received a $200 commission on each of the two sales, and her second (and final) referral sale involving an ILR occurred during the pay period ending on May 24, 2009. (Duberg Decl. ¶ 9; *id.* Ex. D.) Boston Scientific's agreement with Transoma expired in June 2009; according to the company, Duberg was marketing the devices through the agreement's expiration. (Berens Decl. ¶ 12.) Medtronic, on the other hand, is the market leader in ILR sales. (Keller Decl. ¶ 5.) Its ILR is

known as the Reveal. According to Medtronic, it uses a "dual distribution" strategy to sell the Reveal. It has a dedicated subcutaneous diagnostics and monitoring (SQDM) sales force that sells only the Reveal; additionally, Medtronic's CRM sales representatives sell ILRs as well as other CRM devices.

Duberg resigned from Boston Scientific on May 27, 2010, to accept a position as a sales representative for Medtronic. In the last year of her employment with Boston Scientific, she sold and promoted pacemakers, defibrillators, and other CRM devices to customers in and around Flint, Michigan. After she resigned, Boston Scientific sent her a letter reminding her of her noncompete agreement. (Mem. in Supp. Ex. B.) It listed a number of the doctors and hospitals at which she had worked in her last year of employment and which, as a result, were restricted under the agreement, including McLaren Regional Medical Center ("McLaren"), Genesys Hospital in Grand Blanc, Michigan ("Genesys"), and cardiologists Syed Ahmed and Abdul Alawwa in Flint. It appears that Duberg did not dispute the contents of this letter.

As a CRM sales representative for Medtronic, Duberg sells both CRM devices and the ILR. According to Duberg and Medtronic, she was instructed not to sell or market CRM devices or attend CRM implants at any of her restricted accounts during the one-year term of her noncompete. (Keller Decl. ¶¶ 3–6; Duberg Decl. ¶¶ 5–7.) Another Medtronic CRM sales representative, Herb Hall, is responsible for CRM sales to Duberg's restricted accounts. (Keller Decl. ¶ 3; Duberg Decl. ¶ 7; Declaration of Herb Hall ("Hall Decl.") ¶ 3.) However, Duberg and Medtronic acknowledge that she is selling the ILR at restricted accounts, as well as selling CRM devices to accounts that are not restricted under her noncompete agree-

ment. (Keller Deck ¶ 3; Duberg Decl. ¶ 7.)

Other Boston Scientific sales representatives have seen Duberg in the following situations at hospitals that are her restricted accounts:

- On October 13, 2010, Duberg was seen outside the cardiac catheterization labs at McLaren where two cardiologists were working, and she told one of the physicians that she would be around all day. (Declaration of Kimberly Evans ("Evans Decl.") ¶ 5.) Later that same day, Duberg was seen in a conference room at the hospital with Herb Hall, who sold CRM devices at her restricted accounts. The two, along with Medtronic's Regional Vice President, appeared to be waiting to meet with a physician. (*Id.* ¶¶ 10–11.)

- On October 20, 2010, Duberg was seen at McLaren at 10:30 a.m. with a Medtronic programmer cart outside a cardiac catheterization lab where a procedure was in process. (Declaration of Kimberly Bose ("Bose Decl.") ¶¶ 4–5.) Duberg told Bose she was there to assist with an ILR procedure, but the only ILR procedure scheduled that day was at 3:00 p.m. (*Id.* ¶¶ 7, 9.)

- On November 3, 2010, Bose saw Duberg at Genesys, accompanied by a Medtronic CRM clinical employee. She was outside the cardiology procedures suite speaking with a hospital employee who was responsible for purchasing CRM and other medical devices. (*Id.* ¶¶ 10–12.) Duberg was seen again at Genesys on November 5, 2010. (Evans Decl. ¶ 15.)

- Most recently, on November 10, 2010, Duberg was again seen at McLaren, this time outside the cardiology procedure labs with a Medtronic programmer cart at around 10:30 a.m. (*Id.* ¶ 14.) A patient having a Medtronic

pacemaker procedure was waiting in the catheterization lab, and the pacemaker implant procedure was scheduled for 10 a.m. (*Id.* ¶ 15.) No ILR procedure was scheduled at McLaren that day, and Bose saw no other Medtronic representatives present. (*Id.* ¶ 16.) Upon seeing Bose, Duberg purportedly hurried away from the cardiology suite and left the hospital through a fire exit while talking on her cell phone; about ten minutes later, another Medtronic clinical representative arrived to handle the pacemaker case. (*Id.* ¶ 14–15.) [5]

Additionally, Boston Scientific points to a Medtronic marketing event held on June 30, 2010. Although the formal invitation to this event indicated that it was hosted by Herb Hall, a Boston Scientific employee saw an announcement about the event on a whiteboard in McLaren's cardiac catheterization lab which stated the event would be "hosted by Herb and Mary Evelyn." (Second Decl. of Carmen Nasello ("2d Nasello Decl.") Ex. A.) [6]

Boston Scientific has filed the instant action alleging that Duberg is violating her noncompete agreement, and now seeks to enjoin Duberg from selling or supporting the sale or implantation of any competitive products, including not only CRM devices but ILRs as well.

## STANDARD OF DECISION

▆▆▆ This Court must consider four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) *(en banc); accord Watkins, Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir.2003) (quoting *Dataphase*). To analyze these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.,* 182 F.3d 598, 601 (8th Cir.1999). A preliminary injunction "is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). The burden of establishing the four *Dataphase* factors lies with the party seeking injunctive relief. *Watkins,* 346 F.3d at 844.

## ANALYSIS

### I. Likelihood of success

In order to obtain a preliminary injunction, Boston Scientific must show that it has a "fair chance of prevailing" on its claims. *Planned Parenthood Minn., N.D., S.D. v. Rounds,* 530 F.3d 724, 732 (8th Cir.2008). "An injunction cannot issue if

---

**5.** Boston Scientific also highlights two incidents on June 1 and June 7, 2010, involving Duberg allegedly violating her noncompete restrictions by participating in a case with Dr. Ahmet and scheduling a luncheon with Dr. Alawwa's office. It appears that Boston Scientific brought this to Medtronic's attention and the alleged violations were addressed. (*See* Mem. in Opp'n Ex. B.) Because these incidents do not alter its conclusion, the Court does not rely on them in granting the instant Motion.

**6.** Defendants argue that this announcement is irrelevant because it's unclear who wrote it. Regardless who authored the announcement, it suggests a general perception at McLaren Hospital that Duberg continued to be involved with CRM devices. The Court notes, however, that it would reach the same conclusion even without considering this evidence.

there is no chance on the merits." *Mid–Am. Real Estate Co. v. Ia. Realty Co.,* 406 F.3d 969, 972 (8th Cir.2005). However, the question is not whether Boston Scientific has "prove[d] a greater than fifty percent likelihood that [it] will prevail," *PCTV Gold. Inc. v. SpeedNet, LLC,* 508 F.3d 1137, 1143 (8th Cir.2007), but rather whether any of its claims provide a "fair ground for litigation," *Watkins,* 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold,* 508 F.3d at 1143. In the Court's view, Boston Scientific has shown sufficient likelihood of success on its claim that Duberg violated her noncompete agreement.

▮▮▮ The parties do not dispute that Minnesota law governs this action. Under Minnesota law, employment noncompete agreements are generally disfavored. *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 361 (Minn.1998). However, a noncompete will be enforced if it is reasonable and supported by adequate consideration. *Prow v. Medtronic, Inc.,* 770 F.2d 117, 120 (8th Cir.1985). To determine if a noncompete agreement is reasonable, the Court considers: (1) whether the restraint is necessary for the protection of the business or goodwill of the employer; (2) whether the restraint is greater than necessary to adequately protect the employer's legitimate interests; (3) how long the restriction lasts; and (4) the geographic scope of the restriction. *Id.* (citing *Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 134 N.W.2d 892, 899 (1965)).

Courts have repeatedly recognized that noncompete agreements in the medical device industry serve employers' important and legitimate interests in long-term customer relationships and preserving goodwill. *Guidant Sales Corp. v. Niebur,* No. 01–1772, 2001 WL 1636502, at *7 (D.Minn. Oct. 18, 2001) (Frank, J.); *accord, e.g.,*

*Prow,* 770 F.2d at 117; *Medtronic, Inc. v. Gibbons,* 527 F.Supp. 1085 (D.Minn.1981), *aff'd* 684 F.2d 565 (8th Cir.1982). Indeed, the Court "has consistently found one-year restrictions that are limited to a former employee's sales area to be reasonable." *Guidant Sales Corp. v. Baer,* No. 09–CV–0358, 2009 WL 490052, at *4 (D.Minn. Feb. 26, 2009) (Schiltz, J.). As in *Baer,* "the noncompete in this case is even more narrowly drawn" because it applies "only to customers with whom [Duberg] had sales-related contacts in the year preceding the termination of [her] employment." *Id.* Duberg's noncompete is entirely reasonable in both temporal and geographic scope. Moreover, the parties do not dispute that it was supported by adequate consideration.

Although the Defendants do not argue that the noncompete agreement was invalid, they *do* dispute whether Boston Scientific has shown a sufficient likelihood of success on its claims that Duberg violated the agreement. Herein lies the crux of the current Motion.

Boston Scientific asserts that Duberg has violated her noncompete agreement by selling or supporting both CRM devices and ILRs with respect to her restricted accounts. Duberg and Medtronic acknowledge that Duberg was selling and supporting ILRs for doctors and hospitals restricted by her noncompete agreement; however, they argue that she sold *only* ILRs to her restricted accounts and that ILRs do not constitute "Competitive Products" under the agreement's terms.

There is some evidence that Duberg indeed sold or supported CRM devices, in the form of declarations from other Boston Scientific employees who encountered her at restricted accounts in suspicious circumstances. Most troubling is the incident recounted by Kimberly Bose. Bose asserts that she saw Duberg at McLaren

outside the cardiology procedures suite with a programmer cart within fifteen minutes of a scheduled Medtronic pacemaker implantation procedure on a day when no ILR procedures were scheduled. (Bose Decl. ¶¶ 14–16.) For her part, Duberg does not recall being at McLaren on the day in question. However, Bose claims that when Duberg saw Bose, she hurried away and left the hospital by the fire exit, and ten minutes later another Medtronic representative arrived to handle the pacemaker procedure. (*Id.*)

Moreover, even if Duberg is only visiting her old accounts to directly sell and support the ILR (which she acknowledges she is doing), there remains a "fair ground for litigation" whether this violates the noncompete agreement. Although ILRs may not be "Competitive Products," Duberg is not restricted only from selling or supervising the implantation of competitive products; the agreement also extends to "*support[ing]* the sale of" and "otherwise having any involvement whatsoever with the sale, marketing or other business aspect of any Competitive Product." (Duberg Decl. Ex. C § 3.) Further, its restrictions "apply regardless of whether [Duberg] acts directly or indirectly." Boston Scientific argues, persuasively in this Court's view, that selling ILRs "often leads to the sale—by the same representative, to the same doctor—of a CRM device." (Berens Decl. ¶ 19.) As evidenced by Medtronic's own "dual distribution" strategy for ILRs, there is significant overlap in the sales of ILRs and CRMs—so much so that Medtronic's CRM sales representatives also sell ILRs. (Keller Decl. ¶ 6.) While the diagnostic function of an ILR may differ from the therapy CRM devices provide, both types of devices deal with cardiac rhythms, and both are marketed and sold to the same client base of doctors.

In *Guidant v. Niebur*, one of the defendant sales representatives, who signed a noncompete agreement virtually identical to Duberg's, argued that he was "promoting only non-CRM products" for his new employer (St. Jude), including electrophysiology devices (such as ILRs). *See* 2001 WL 1636502, at *2–3. In granting a TRO in *Niebur*, the Court reasoned that "even if [defendants] are only responsible for selling non-CRM devices for St. Jude, their continued contact with their former Guidant CRM customers *inevitably facilitates the promotion and sale of St. Jude CRM devices.*" *Id.* at *7 (emphasis added). The same is true here. Duberg's continued contact with the same hospitals and cardiologists, including selling ILRs to them, is likely "supporting the sale of" and indirectly helping to market Medtronic CRMs—actions her noncompete agreement also prohibits. *See Baer*, 2009 WL 490052, at *5 ("Baer's preexisting sales relationships with these doctors also supports and inference that [his] later contacts with them were for the purpose of supporting sales."). Thus, Boston Scientific has established a likelihood of success of showing that Duberg breached the terms of her valid noncompete agreement.

## II. Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil Inc.*, 190 F.3d 924, 926 (8th Cir.1999) *(per curiam)* (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Id.*; *accord, e.g., Winter*, 129 S.Ct. at 375–76. In the Court's view, Boston Scientific has shown a sufficient threat of irreparable harm here.

Minnesota courts have consistently held that "[i]rreparable harm may be inferred from breach of a valid non-compete agreement if the former employee obtained a personal hold on the good will of the former employer." *St. Jude Med. S.C., Inc. v. Ord*, Civ. No. 09–738, 2009 WL 973275, at *5 (D.Minn. Apr. 10, 2009) (Ericksen, J.); *accord Baer*, 2009 WL 490052, at *6. As Boston Scientific explains, the clientele for its medical devices is highly sophisticated, requiring representatives to have deep sales, technical, and clinical knowledge in order to successfully market and sell the company's devices. (Berens Decl. ¶ 7.) Long-term customer relationships are crucial to the success of a sales representative and the company whose products she sells. (*Id.* ¶ 8.) In fact, relationships between a representative and doctors are so vital that Boston Scientific "devotes substantial time, effort, and expense to have its sales representatives establish and maintain the trust of customers and potential customers." (*Id.* ¶ 9.) Duberg's own assertion further evinces this: she changed employers partly due to her customers' urging because they wanted to keep working with her but wanted to use a different company's devices. (Duberg Decl. ¶ 3.)

■ As this Court has previously recognized, "[b]ecause customer relationships were developed over significant time periods with substantial investment of [Boston Scientific] training sessions and clinical support, its interest is substantial." *Niebur*, 2001 WL 1636502, at *8 (finding irreparable harm). Given the importance of customer relationships and good will to its business, "if no restraint [is] imposed, then [Boston Scientific] will likely lose valuable business relationships in the limited market of the [Flint, Michigan] territory." *Id.* "The Court is satisfied that, as a result of [her] work with [Boston Scientific], [Duberg] is the beneficiary of the good will of [Boston Scientific]'s customers and that

[Boston Scientific] faces irreparable harm from continued noncompete violations by [Duberg]." *Ord*, 2009 WL 973275, at *5.

## III. The remaining factors

In addition to showing likelihood of success on the merits and irreparable harm, Boston Scientific must also establish that the balance of harms and public interest favor granting preliminary injunctive relief.

■ The possibility of harm to Duberg if preliminary injunctive relief is granted is minimal compared to the irreparable harm Boston Scientific faces if she has indeed violated her noncompete agreement. Duberg may still sell CRM and ILR devices to doctors and hospitals that are outside her restricted accounts. Although not selling ILRs to her old clients may result in a less successful year in sales than she would otherwise have, she will still be able to generate income. As Defendants explained at oral argument, ILRs do not generate a significant amount of income for sales representatives, so enjoining Duberg from selling them to her restricted accounts would have minimal impact her compensation. Additionally, Defendants advised the Court, upon its request, that Duberg's employment agreement with Medtronic provides for some guaranteed commissions through the end of April 2011. When a sales representative leaves one medical device company to accept employment at another receives some guaranteed compensation during the first year of her new employment, as Duberg is here, the balance of harms favors the moving party. *E.g., Baer*, 2009 WL 490052, at *7 ("Given that Baer's compensation is guaranteed regardless of the outcome of Guidant's motion, the balance of harms tilts strongly in Guidant's favor"); *Niebur*, 2001 WL 1636502, at *8.

Moreover, Minnesota courts have repeatedly found that "the public interest favors the enforcement of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition." *Niebur*, 2001 WL 1636502, at *8; *accord Ord*, 2009 WL 973275, at *6 ("[T]he public interest is served by upholding parties' contractual obligations, and Minnesota law permits use of noncompete agreements to protect an employer's goodwill.") (internal citations omitted); *Baer*, 2009 WL 490052, at *7 (same).

## CONCLUSION

The Court finds that each of the factors discussed above weighs in favor of granting Boston Scientific's Motion and enjoining Duberg from continuing to engage in conduct likely prohibited by her noncompete agreement. Since this Order will bind all the parties pursuant to Federal Rule of Civil Procedure 65(d)(2), the Court sees no need to separately address the request for injunctive relief against Medtronic and declines to do so.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED:**

1. Boston Scientific's Motion for a Temporary Restraining Order (Doc. No. 2) is **GRANTED;**

2. Duberg is **ENJOINED,** from the effective date of this Injunction until May 27, 2011 (one year from the date she left Boston Scientific), from selling, soliciting the sale of, supporting the sale of, supporting or supervising the sale or implantation or other use of, or otherwise having any involvement whatsoever with the sale, manufacturing, research and development, marketing or other business aspect of any Competitive Product, including but not limited to insertable loop recorders, with respect to any GSC Account, including but not limited to the following physicians and facilities: Dr. Abdul Alawwa; Dr. Asim Yunus; Dr. Omar Bakr; Dr. Syed Ahmed; Dr. Abdul Hasnie; Dr. Wilfredo Rivera; Dr. Richard Henning; Dr. George Predeteanu; Dr. Sherry Brooks; Dr. Luay Alkotob; Dr. Jeff Harris; Dr. Mo Amlani; Dr. Eg Raj; Dr. Randy Liberman; Dr. Sami Elian; Dr. James Chambers; Dr. Scott Huffaker; Dr. David Brill; Dr. Majed Nounou; Dr. Ramesh Misra; Dr. Matthew Ebinger; Dr. Voung Duthin; Genesys Hospital (Grand Blanc, MI); Hurley Hospital (Flint, MI); McLaren Hospital (Flint, MI); Lapeer Regional Hospital (Lapeer, MI); Memorial Healthcare (Owosso, MI); St. Mary's Medical Center (Saginaw, MI); Covenant Cooper Health Center (Saginaw, MI); Sparrow Medical Center (Bay City, MI); Mid Michigan Medical Center (Midland, MI); and Gratiot Medical Center (Alma, MI). These restrictions shall apply regardless of whether Duberg acts directly or indirectly or whether she acts personally or as an employee, agent, or otherwise for another;

3. "GSC Account" and "Competitive Product" shall have the meanings as provided in the 2008 noncompete agreement, which is attached as Exhibit C to the Declaration of Mary Evelyn Duberg (Doc. No. 16); and

4. Boston Scientific is **ORDERED** to file a bond in the amount of $100,000. The Injunction in Paragraph 2 of this Order will take effect upon the filing of this bond.