# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1975
_____

Tod T. Tumey; Tumey, LLP

*Plaintiffs - Appellees*

v.

Mycroft AI, Inc.

*Defendant - Appellant*

Joshua Montgomery; Michael Lewis

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 12, 2022
Filed: March 4, 2022

_____

Before SMITH, Chief Judge, WOLLMAN and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Mycroft AI, Inc.; Joshua Montgomery; and Michael Lewis appeal the district court's grant of a preliminary injunction. We vacate the injunction and remand for reassignment to a different judge.

# I. BACKGROUND

Tod Tumey is an attorney who resides in Texas and is the managing partner of Tumey L.L.P. Mycroft is a Delaware corporation with its principal place of business located in Kansas City, Missouri. Mycroft's business is an open-source network focusing on voice assistance technology. It permits unfettered access to its source code so others can build new technologies and tools utilizing Mycroft's unique voice assistant capabilities. Joshua Montgomery ("Montgomery") is a resident of Hawaii and the founder of Mycroft. Michael Lewis ("Lewis") resides in California and is Mycroft's chief executive officer.

In February 2021, Tumey and Tumey L.L.P. (collectively, "Tumey") brought this action, alleging that Tumey's representation of Voice Tech Corporation in pending and separate patent infringement lawsuits[1] against Mycroft, Montgomery, and Lewis (collectively, "Mycroft") prompted Mycroft to retaliate by launching and/or inspiring a series of cyber-attacks against Tumey. In the complaint, Tumey alleged three waves of targeted cyber-attacks and harassment activity that, at various times, hindered his ability to serve his clients, required him to incur expenses in lost time and productivity, forced him to hire a computer specialist to assist in defending against the attacks, and interfered with his and his family's email and social media accounts. In addition to the information warfare, Tumey claims that since the complaint in this case was served, his law firm has received phone calls in which the caller "menacingly breathes and hangs up." He contends the firm and its personnel have continued to experience cyber-attacks, hacking attempts, and heavy-breathing phone calls.

---

[1]On December 13, 2021, the United States Patent and Trademark Office determined that all claims for one of the patents in the underlying patent litigation are unpatentable and the patent's claims will be cancelled in their entirety unless the decision is overturned. The remaining patent involved in the litigation is under agency review, with a final decision expected in May 2022.

Tumey's complaint alleges violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1962(c) & 1962(d); the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.; the Stored Wire and Electronic Communications Act, 18 U.S.C. § 2701, et seq.; and various state and common law claims for tampering with computer data equipment, breach of computer security, intrusion on seclusion, tortious interference with business expectancy, assault, and intentional infliction of emotional distress.[2]  Trial is currently scheduled to begin on August 29, 2022.

Mycroft has publicized its general view of patent trolls and specifically its involvement in the underlying patent litigation.  These efforts have included writing articles, posting comments on social media, and asking others who believe patent trolls are bad for open source to re-post, link, tweet, and share its posts.  Specifically, Mycroft announced on its blog that its policy is to "attack bogus patents" and has vowed "to litigate every single patent suit to the fullest extent possible including appealing any adverse decisions all the way to the Supreme Court."  In reference to patent trolls, Mycroft expressed its belief that it is "better to be aggressive and 'stab, shoot and hang' them, then dissolve them in acid."  At one point, it posted on its blog links to "Tumey's 'confidential correspondence'" as well as documents in the underlying patent infringement lawsuit.  Mycroft has kept its followers updated on developments in the underlying patent litigation with headlines such as "Mycroft Defeats Patent Trolls . . . Again . . . For Now"; has cautioned patent trolls to "stay away" from Mycroft because "You'll get your ass kicked;" and has described its motive as "Rather than pay the troll toll, we decided to accept the fight."

In the underlying patent litigation, Tumey (on behalf of Voice Tech Corporation) moved for an order requiring decorous and civil conduct by the parties, which included a request that Mycroft cease using the term "patent troll."  In April 2020, the court orally ordered that, at least for the pendency of the case or until ordered otherwise, Mycroft (1) remove the links to Tumey's confidential

---

[2]The district court has granted Mycroft's motion to dismiss claims pertaining to the Stored Wire and Electronic Communications Act, assault, and intentional infliction of emotional distress.

correspondence; (2) delete the request for others to share Mycroft's posts or otherwise call people into action; and (3) take down what the court viewed as threatening or improper statements. The court further ordered Mycroft to "assertively search and take down" similar statements whether posted on Facebook, blogs, or wherever. Mycroft viewed the order as sufficiently narrow and limited in scope such that it was willing to comply with the restrictions rather than appeal.

In this action, Tumey sought to expand the restrictions and moved for a temporary restraining order or, in the alternative, an expedited preliminary injunction. The grounds for the request included the cyber-attacks, phishing, and harassing phone calls that Tumey and his family experienced and expected to continue to endure absent a court order. Tumey believed Mycroft was responsible for the attacks because the company's executives had the expertise, and the attacks would intensify after a significant event in the litigation occurred. For relief, Tumey requested that the district court "enter an order temporarily restraining and enjoining—for 14 days from the date of the order, and subject to extension by the Court for good cause—Defendants [and others]" from engaging in certain specified conduct, including cyber-attacks, hacking, and other harassing behavior. Tumey circulated to the district court and opposing counsel a proposed temporary restraining order.

Mycroft opposed the motion for a temporary restraining order, contending there was no evidence to attribute any of the cyber-attacks or phone calls to Mycroft. Mycroft has maintained, and vigorously argued to the district court, that Tumey's case is built around mere speculation. As part of its response to the motion, Mycroft submitted sworn declarations averring that no one associated with Mycroft was involved in the cyber-attacks or harassment being waged on Tumey personally, his firm, or Tumey's family.

The court set a telephone conference on the "Motion for Temporary Restraining Order" for March 29, 2021, at 1:00 p.m. R. Doc. 20. The notice was updated on March 26, 2021, to reflect the "evidentiary hearing" would be held via

videoconference.  R. Doc. 31.  At 11:54 a.m. (about one hour before the hearing's scheduled start time), Tumey circulated to the court and counsel a proposed preliminary injunction order.  At the hearing, Mycroft objected to converting the request for a temporary restraining order to a preliminary injunction, specifically expressing concerns about the last-minute conversion:

> We are going to - - we would object strongly to a preliminary injunction being the ultimate order in this particular proceeding.
>
> As you can appreciate here early on, we've had an opportunity to - - to do no discovery.  And as you'll hear, we believe there's a complete absence of any real meaningful information about intrusions and how those occurred with respect to the plaintiffs, whether it's their computer systems or other information.  And we would - - if we're going to go down the preliminary injunction route, we would like to have the opportunity to have our expert do his own analysis so that we can respond in a meaningful way.
>
> Plaintiffs said, I thought rather ironically, in their - - in some of their suggestions that our expert wasn't detailed and specific.  Well, it's because he doesn't have information because there wasn't any information of any real substance included in their expert's declaration.  So we've not had an opportunity to really do the kind of analysis that would be necessary to determine whether any of the defendants in this case were actually the ones who - - who did any acts as alleged in the complaint or in the motion for - - motion for TRO or preliminary injunction.
>
> So, Judge, that would be my only thing is to make our strong objection to the idea that we would proceed on a preliminary injunction that would stand up in this court and - - in this case, rather, until final determination on the merits.

The district court was unpersuaded by Mycroft's objection and proceeded to receive testimony from Tod Tumey, Chilton Webb, Christina Butler, and Michael Perry.  Tumey and Webb are business partners.  Tumey represented Webb for a few years on patent matters.  Tumey retained Webb to fend off and analyze the attacks.

Tumey and Webb offered detailed testimony about the nature and extent of the cyber-attacks and harassing behavior. But, when Tumey was asked by Mycroft's counsel about his analysis of the many emails and whether any appeared to come from any of the Mycroft defendants, Tumey responded: "No. Just the pure timing of them." When counsel attempted to inquire further about the results of Webb's investigation, the court interrupted and *sua sponte* ordered Tumey not to disclose what the investigation had uncovered. Similarly, when Mycroft's counsel asked Webb about any connection he found to Lewis, Webb responded: "I'm not going to bring up the evidence we have in this case right now, which you guys will see soon enough." Webb described how he set up a trap (a "honey pot") to identify the perpetrators and though there were increased hacks or attempted hacks logged following activity in this case (such as when the complaint was filed), Webb has yet to identify the perpetrator(s). Webb testified that he had not found any forensic evidence to attribute any of the cyber-attacks or harassment to any of the Mycroft defendants.

Tumey called Butler as his final witness at the hearing. Butler lives next door to Montgomery in Hawaii. Butler found her way into this case after a few negative encounters with Montgomery caused her to do a Google search of Montgomery's name "to see what type of man lived next to me." Butler happened upon information about the underlying litigation and decided to connect with Tumey, believing she possessed bad character evidence about Montgomery that would discredit Montgomery. The district court allowed Butler to testify over Mycroft's objection on relevance grounds. Butler testified about her disputes and other encounters with Montgomery in Hawaii, none of which related to any personal knowledge about the cyber-attacks, cyber-security issues, or harassment issues in this case. It's fair to say that Butler and Montgomery have a negative relationship and do not like each other.

Mycroft called one witness, Perry, who has a bachelor's degree in information technology and holds two certifications specific to digital forensics and incident response. Perry opined that Webb lacked evidence to support his declarations, that there was probably malware on Tumey's computer systems that was associated with

at least one of the phishing attacks, and there was no computer forensics that could attribute any of the conduct to any of the Mycroft defendants.

In closing, Mycroft argued to the district court that the request for injunctive relief necessarily failed because Tumey was unable to provide adequate evidence connecting Mycroft to any of the attacks or harassment. Mycroft suggested there were many others that could be behind the attacks and harassment, such as inventors who dislike patent trolls[3] and privacy advocates that firmly support Mycroft's product privacy development and seek to deter Tumey from threatening or continuing with his expensive patent infringement suits.

The district court was unpersuaded by Mycroft's arguments. At the close of the hearing, the court summarily stated that all the factors it was supposed to consider when analyzing a request for injunctive relief favored Tumey and concluded it would grant a preliminary injunction. The court allowed the parties to submit revisions to the proposed preliminary injunction. Two days after the hearing, the court entered a written order granting injunctive relief. The court ordered, in relevant part:

> Defendants, as well as Defendants' officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with any of them, shall be immediately preliminarily enjoined and restrained from:
>
> 1. Engaging in, participating in, or recklessly or intentionally inciting any cyberattacks, hacking or other harassment directed at Plaintiffs, including Plaintiffs' officers, agents, servants, employees, attorneys, witnesses and potential

---

[3]"Patent troll" is a concept and a term that has been recognized by the United States Supreme Court. See Commil USA, LLC v. Cisco Sys., Inc., 575 U.S. 632, 646 (2015) (acknowledging the use of "patents as a sword to go after defendants for money, even when their claims are frivolous"); id. at 649 (Scalia, J., dissenting) (expressing concern that by not allowing a good faith belief in invalidity to be asserted as a defense to a claim of induced infringement, it "increases the *in terrorem* power of patent trolls").

witnesses (including Chilton Webb and Christina Butler), and the family members of any of the foregoing (the "Protected Parties"); and

2. Using or disclosing any documents, information, or other materials of any kind obtained from Plaintiffs or any other Protected Party through any unauthorized means.

Mycroft unsuccessfully moved to vacate or stay the order pending appeal. Mycroft asserted that issuance of the injunction was erroneous and/or unconstitutional because it (1) is based on the unfounded factual premise, unsupported by evidence, that Mycroft was responsible for the cyber-attacks and harassment; (2) is unconstitutionally vague since Mycroft may be punished for any attacks or attempts to attack Tumey at any time by any third-party without having to show Mycroft was responsible; (3) is a prior restraint on speech and publication, which is presumptively unconstitutional; and (4) is overbroad in that it prohibits speech protected by the First Amendment. The district court did not address any of Mycroft's claims; instead, concluding there was no reason to depart from its prior findings and rulings. This appeal followed.[4]

## II.   DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); see Munaf v. Geren, 553 U.S. 674, 689 (2008) (noting as a basic principle that "[a] preliminary injunction is an 'extraordinary and drastic remedy'" that requires an examination of the "likelihood of success on the merits"). This Court has described the primary function of a preliminary injunction as preserving the status quo until the district court has an opportunity to grant full effective relief. Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 490 (8th Cir. 1993) (cleaned up).

---

[4]On February 3, 2022, this Court granted an emergency motion to stay the preliminary injunction pending the disposition of the appeal.

"Requiring [the defendant] to take affirmative action . . . before th[e] issue has been decided on the merits goes beyond the purpose of a *preliminary* injunction." Id.

"[T]he burden of establishing the propriety of an injunction is on the movant." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (quoting Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)). As the Supreme Court has succinctly stated: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20; see Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). The movant must show that "irreparable injury is *likely* in the absence of an injunction, not merely a "possibility" of irreparable harm before a decision on the merits can be rendered. Id.

This Court has stated that "[w]hile no single factor is determinative, the probability of success factor is the most significant." Carson v. Simon, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up). Our review of a preliminary injunction is layered: we apply clear error to fact findings, *de novo* review to legal conclusions, and abuse of discretion to the ultimate decision to grant the injunction. Comprehensive Health of Planned Parenthood Great Plains v. Hawley, 903 F.3d 750, 754 (8th Cir. 2018) (citation and quotation marks omitted). We often give deference to a district court's grant of a preliminary injunction due to "its greater familiarity with the facts and the parties." Jet Midwest Int'l Co., Ltd. v. Jet Midwest Group, LLC, 953 F.3d 1041, 1044 (8th Cir. 2020). As a general principle, this Court will not disturb the issuance of a preliminary injunction so long as the decision "remains within the range of choices available to the district court, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error or judgment." PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1142 (8th Cir. 2007) (citation omitted).

### A. Notice and Meaningful Opportunity to Prepare

Fed. R. Civ. P. 65(a)(1) provides: "The court may issue a preliminary injunction only on notice to the adverse party." The United States Supreme Court explained in 1972 that "[f]or more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." Fuentes v. Shevin, 407 U.S. 67, 80 (1972) (cleaned up). To be effective, notice must be given "at a meaningful time and in a meaningful manner." Id. (discussing the notice requirement in the context of procedural due process). In the context of Rule 65(a)(1)'s notice requirement before a preliminary injunction can issue, the rule "implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty., 415 U.S. 423, 432 n.7 (1974) (citation omitted). Same-day notice does not suffice. Id.

We have grave doubts that the notice was sufficient to allow Mycroft a meaningful opportunity to prepare prior to issuance of the preliminary injunction. The briefing focused on the request for a temporary restraining order. The proposed order submitted by Tumey was identified as a temporary restraining order. The district court set the matter on for a hearing on the motion for a temporary restraining order. While the standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction, there is a material difference in the allowed duration, which is significant to the affected party. Compare Fed. R. Civ. P. 65(b)(2) (temporary restraining order not to exceed 14 days unless for good cause the court extends it for a like period or the adverse party consents to a longer duration), with Fed. R. Civ. P. 65(a) (no express limitation on time, except the apparent limitation of an adjudication on the merits such that the injunction may either be dissolved or a permanent injunction may enter).

Tumey provided an hour's notice that he sought to transform what had been understood by everyone as a request for a temporary restraining order to a

-10-

preliminary injunction. While Mycroft had an opportunity to participate in an adversarial hearing in a sense that it was allowed to cross-examine Tumey's witnesses and present its own evidence, Mycroft's ability to mount a defense was hampered by the non-disclosure and concealment of evidence that Tumey allegedly had in his possession connecting Mycroft to the attacks and harassment. Not only had no discovery been exchanged but Mycroft was prevented by the court at the hearing from discovering the nature of evidence, if any, Tumey had to connect Mycroft to the behavior in question. While this Court has allowed the grant of a preliminary injunction to stand without a developed record when the facts and issues are overly complicated, see Jet Midwest Int'l Co., Ltd., 953 F.3d at 1045, this case does not have that feel. Any complexity here was not in the nature of the facts or evidence but rather the lack of any opportunity by Mycroft to discover the evidence connecting it to the harassing behavior such that it would have a meaningful opportunity to defend against that evidence prior to the issuance of a preliminary injunction. As noted by Mycroft's counsel at the hearing:

> It doesn't seem to me that when you come in and ask for injunctive relief and then say, well, but we're not going to share some of the evidence we have of it, you're going to have to rely on these generalities, it's very hard for us, then to - - properly challenge that evidence, which is - - which is what our obligation is and what our right is is to challenge that information against us. But yet we're told we're not going to share that information because it's too sensitive, without seeking a protective order or some way to protect that information prior to - - prior to sharing it in court.

Based on this record, we doubt whether Mycroft was given sufficient notice and afforded a fair opportunity to defend against Tumey's allegations prior to the issuance of a preliminary injunction. Even without the issues regarding notice and opportunity to prepare, the injunction cannot stand, however, because, on this record, the factors for granting injunctive relief do not weigh in Tumey's favor.

*B.    Preliminary Injunction Factors*

Even if there was no procedural due process issue, the district court committed a clear error of judgment when it issued a preliminary injunction based on a lack of evidence demonstrating Mycroft was responsible for the conduct at issue. The only evidence Tumey directly pointed to at the hearing was temporal proximity. The testimony from both Tumey and his expert, Webb, was that there was an attack or uptick in harassing activity when a significant development in the litigation occurred. Subject to limited exceptions, however, court documents and court proceedings are open to the public. Too much weight cannot be placed on timing when, as in this case, public documents and proceedings are involved.

Further, others in addition to Mycroft have an interest in curbing what has been described as the patent troll industry. As explained by the Supreme Court, it is well known that an industry has developed in which law firms use patents not for their intended use of producing and selling goods but, instead, primarily for obtaining license fees. Some in this industry have used, or threaten to use, litigation as a way to extract licensing fees, even if the patent being wielded is invalid. Commil, 575 U.S. at 646. Justice Scalia expressed concern about court decisions that have the effect of increasing "the *in terrorem* power of patent trolls." Id. at 649. While we need not decide if this case is part of the patent troll industry, we note that one of the patents in the underlying litigation has already been found invalid and the other one is under review by the United States Patent and Trademark Office. The heightened public interest about the issues before the district court is a consideration that should not be ignored when determining the appropriateness of injunctive relief. See Benisek v. Lamone, 585 U.S. __,138 S. Ct. 1942, 1943-44 (2018) (explaining a court must consider the three other factors, including whether the movant has shown that an injunction is in the public interest, because "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits").

-12-

In searching the record for other possible evidence of a nexus to Mycroft, we note the honey pot that Webb created, which did not allow him to identify the perpetrator(s), as well as Mycroft's expertise. While it is indisputable that Montgomery and Lewis have particular skill, expertise, and resources that render them capable of executing the cyber-attacks, they are not the only ones with the capability, nor are they the only ones, as described in the preceding paragraph, with motive to try to shut down or inconvenience litigation involving a suspected patent troll. There exists specific public interest in this particular case by Mycroft followers who seek to ensure the open-source network remains available.

In conclusion, assuming as true each of the allegations regarding the nature and extent of the cyber-attacks and harassment and accepting as true the testimony proffered by and on behalf of Tumey at the hearing, there is a paucity of evidence in this record to find that Mycroft is behind the attacks. The attacks are unacceptable and deserving of redress, but for there to be a showing of a likelihood of success on the merits to warrant injunctive relief, Tumey must show that he has "at least a fair chance of prevailing." Miller v. Honkamp Krueger Fin. Servs., Inc., 9 F.4th 1011, 1014 (8th Cir. 2021) (cleaned up). To do so, he must make an adequate showing of a nexus between the unlawful conduct and the responsible individuals. On this record, Tumey has failed to meet his burden and the district court committed a clear error of judgment in finding he did.

As to the other Dataphase factors, even if Tumey came forward with sufficient evidence to connect Mycroft to the unlawful acts, Tumey has not convinced us that money damages are insufficient to compensate him for the alleged injuries. See MPAY Inc. v. Erie Custom Computer Applications, Inc., 970 F.3d 1010, 1020 (8th Cir. 2020) (losses that are quantifiable and compensable with money damages necessarily means that the harm is not irreparable). The absence of irreparable harm "is an independently sufficient ground upon which to deny a preliminary injunction." Grasso Enters., LLC v. Express Scripts, Inc., 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting Watkins, 346 F.3d at 844). Given these findings, we need not resolve Mycroft's constitutional claims regarding the breadth or nature of the injunction.

## C. Request for Reassignment

Mycroft has requested that this case be reassigned to a different judge. Federal appellate courts are vested with authority under 28 U.S.C. § 2106 to reassign a case to a different judge on remand. Liteky v. United States, 510 U.S. 540, 554 (1994). In determining if reassignment is appropriate, we consider whether the judge's "impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." Sentis Grp., Inc. v. Shell Oil Co, 559 F.3d 888, 904 (8th Cir. 2009) (quoting In re Kan. Pub. Employees Ret. Sys., 85 F.3d 1353, 1358-59 (8th Cir. 1996)).

This Court recognizes that not everything important or that influenced the district court's decision comes through on the printed paged. We also recognize that the personalities of the parties and the lawyers have a significant impact on the way the litigation proceeds. There is little doubt that the parties and the lawyers are engaging in trench warfare. A review of court filings shows that both sides have engaged in the same sort of "scorched earth" tactics; yet an objective review of the record demonstrates a degree of antagonism against Mycroft that is higher than that being applied against Tumey.

After the district court allowed Tumey, over Mycroft's strenuous objection, to transform his motion for a temporary restraining order to a preliminary injunction on one hour's notice, the court further fanned the flames during the hearing by *sua sponte* restricting Mycroft's access to evidence, or lack thereof, connecting Mycroft to the unlawful conduct that took place. Again, over Mycroft's objection, the court allowed testimony about the disputes between neighbors in Hawaii when the relevance, if any, of this testimony to the current litigation is marginal and tangential. The preliminary injunction that was ultimately issued went beyond the intended use of maintaining the status quo until the claims can be resolved. When Mycroft sought reconsideration of the preliminary injunction, specifically raising claims regarding

-14-

the breadth and restraint on speech and publication, the court dismissed, without analysis, Mycroft's constitutional claims.

Upon careful review of the record, while also acknowledging the frustrating conduct by the lawyers and the parties, we find this is a rare case in which the history, proceedings, and order reflect a sufficiently high degree of antagonism against Mycroft to warrant reassignment of the case on remand. See Sentis, 559 F.3d at 905. Because a reasonable person aware of all the circumstances and events that have transpired so far would harbor doubts about the judge's impartiality, reassignment to a different judge is appropriate.

## III. CONCLUSION

For the foregoing reasons, we vacate the preliminary injunction and remand with instructions to assign this case to a different judge.

_____